LUJAN, SECRETARY OF THE INTERIOR, ET AL. *v.*
NATIONAL WILDLIFE FEDERATION ET AL.

No. 89–640. Argued April 16, 1990—Decided June 27, 1990

872

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and KENNEDY, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 900.

*Acting Solicitor General Roberts* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Stewart, Deputy Solicitor General Wallace, Lawrence S. Robbins, Peter R. Steenland, Jr., Anne S. Almy, Fred R. Disheroon,* and *Vicki L. Plaut.*

*E. Barrett Prettyman, Jr.,* argued the cause for respondents. With him on the brief were *John C. Keeney, Jr., Kathleen C. Zimmerman,* and *Norman L. Dean, Jr. William Perry Pendley* filed a brief for respondents Mountain States Legal Foundation et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Farm Bureau Federation et al. by *Kathryn A. Oberly* and *John J. Rademacher;* for the American Mining Congress by *Jerry L. Haggard* and *Gerrie Apker Kurtz;* for the National Cattlemen's Association et al. by *Constance E. Brooks;* for the Pacific Legal Foundation by *Ronald A. Zumbrun, Robin L. Rivett,* and *James S. Burling;* and for the Washington Legal Foundation et al. by *Terence P. Ross, Daniel J. Popeo,* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, and *Craig C. Thompson, Susan L. Durbin, Clifford L. Rechtschaffen,* and *Nilda M. Mesa,* Deputy Attorney Generals, and for the Attorneys General for their respective States as follows: *Robert A. Butterworth* of Florida, *Lacy H.*

JUSTICE SCALIA delivered the opinion of the Court.

In this case we must decide whether respondent, the National Wildlife Federation (hereinafter respondent), is a proper party to challenge actions of the Federal Government relating to certain public lands.

I

Respondent filed this action in 1985 in the United States District Court for the District of Columbia against petitioners the United States Department of the Interior, the Secretary of the Interior, and the Director of the Bureau of Land Management (BLM), an agency within the Department. In its amended complaint, respondent alleged that petitioners had violated the Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat. 2744, 43 U. S. C. § 1701 *et seq.* (1982 ed.), the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*, and § 10(e) of the Administrative Procedure Act (APA), 5 U. S. C. § 706, in the course of administering what the complaint called the "land withdrawal review program" of the BLM. Some background information concerning that program is necessary to an understanding of this dispute.

In various enactments, Congress empowered United States citizens to acquire title to, and rights in, vast portions of federally owned land. See, *e. g.*, Rev. Stat. § 2319, 30 U. S. C. § 22 *et seq.* (Mining Law of 1872); 41 Stat. 437, as amended, 30 U. S. C. § 181 *et seq.* (Mineral Leasing Act of 1920). Congress also provided means, however, for the Executive to remove public lands from the operation of these statutes. The Pickett Act, 36 Stat. 847, 43 U. S. C. § 141 (1970 ed.), repealed, 90 Stat. 2792 (1976), authorized the President "at any time in his discretion, temporarily [to] withdraw from settlement, location, sale, or entry any of the

*Thornburg* of North Carolina, *Anthony J. Celebrezze, Jr.*, of Ohio, *Jeffrey L. Amestoy* of Vermont, and *Joseph B. Meyer* of Wyoming; and for the Wilderness Society et al. by *Bruce J. Ennis, Jr.*

public lands of the United States . . . and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes . . . ." Acting under this and under the Taylor Grazing Act of 1934, ch. 865, 48 Stat. 1269, as amended, 43 U. S. C. § 315f, which gave the Secretary of the Interior authority to "classify" public lands as suitable for either disposal or federal retention and management, President Franklin Roosevelt withdrew all unreserved public land from disposal until such time as they were classified. Exec. Order No. 6910, Nov. 26, 1934; Exec. Order No. 6964, Feb. 5, 1935. In 1936, Congress amended § 7 of the Taylor Grazing Act to authorize the Secretary of the Interior "to examine and classify any lands" withdrawn by these orders and by other authority as "more valuable or suitable" for other uses "and to open such lands to entry, selection, or location for disposal in accordance with such classification under applicable public-land laws." 49 Stat. 1976, 43 U. S. C. § 315f (1982 ed.). The amendment also directed that "[s]uch lands shall not be subject to disposition, settlement, or occupation until after the same have been classified and opened to entry." *Ibid.* The 1964 classification and multiple use Act, 78 Stat. 986, 43 U. S. C. §§ 1411–1418 (1970 ed.) (expired 1970), gave the Secretary further authority to classify lands for the purpose of either disposal or retention by the Federal Government.

Management of the public lands under these various laws became chaotic. The Public Land Law Review Commission, established by Congress in 1964 to study the matter, 78 Stat. 982, determined in 1970 that "virtually all" of the country's public domain, see Public Land Law Review Commission, One Third of the Nation's Land 52 (1970)—about one-third of the land within the United States, see *id.*, at 19—had been withdrawn or classified for retention; that it was difficult to determine "the extent of existing Executive withdrawals and the degree to which withdrawals overlap each other," *id.*, at 52; and that there were inadequate records to show the pur-

poses of withdrawals and the permissible public uses. *Ibid.* Accordingly, it recommended that "Congress should provide for a careful review of (1) all Executive withdrawals and reservations, and (2) BLM retention and disposal classifications under the Classification and Multiple Use Act of 1964." *Ibid.*

In 1976, Congress passed the FLPMA, which repealed many of the miscellaneous laws governing disposal of public land, 43 U. S. C. § 1701 *et seq.* (1982 ed.), and established a policy in favor of retaining public lands for multiple use management. It directed the Secretary to "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values," § 1711(a), required land use planning for public lands, and established criteria to be used for that purpose, § 1712. It provided that existing classifications of public lands were subject to review in the land use planning process, and that the Secretary could "modify or terminate any such classification consistent with such land use plans." § 1712(d). It also authorized the Secretary to "make, modify, extend or revoke" withdrawals. § 1714(a). Finally it directed the Secretary, within 15 years, to review withdrawals in existence in 1976 in 11 Western States, § 1714 (*l*)(1), and to "determine whether, and for how long, the continuation of the existing withdrawal of the lands would be, in his judgment, consistent with the statutory objectives of the programs for which the lands were dedicated and of the other relevant programs," § 1714(*l*)(2). The activities undertaken by the BLM to comply with these various provisions constitute what respondent's amended complaint styles the BLM's "land withdrawal review program," which is the subject of the current litigation.

Pursuant to the directives of the FLPMA, petitioners engage in a number of different types of administrative action with respect to the various tracts of public land within the United States. First, the BLM conducts the review and recommends the determinations required by § 1714(*l*) with

respect to withdrawals in 11 Western States. The law requires the Secretary to "report his recommendations to the President, together with statements of concurrence or nonconcurrence submitted by the heads of the departments or agencies which administer the lands"; the President must in turn submit this report to the Congress, together with his recommendation "for action by the Secretary, or for legislation." § 1714(*l*)(2). The Secretary has submitted a number of reports to the President in accordance with this provision.

Second, the Secretary revokes some withdrawals under § 204(a) of the Act, which the Office of the Solicitor has interpreted to give the Secretary the power to process proposals for revocation of withdrawals made during the "ordinary course of business." U. S. Dept. of the Interior, Memorandum from the Office of the Solicitor, Oct. 30, 1980. These revocations are initiated in one of three manners: An agency or department holding a portion of withdrawn land that it no longer needs may file a notice of intention to relinquish the lands with the BLM. Any member of the public may file a petition requesting revocation. And in the case of lands held by the BLM, the BLM itself may initiate the revocation proposal. App. 56–57. Withdrawal revocations may be made for several reasons. Some are effected in order to permit sale of the land; some for record-clearing purposes, where the withdrawal designation has been superseded by congressional action or overlaps with another withdrawal designation; some in order to restore the land to multiple use management pursuant to § 102(a)(7) of the FLPMA, 43 U. S. C. § 1701(a)(7) (1982 ed.). App. 142–145.

Third, the Secretary engages in the ongoing process of classifying public lands, either for multiple use management, 43 CFR pt. 2420 (1988), for disposal, pt. 2430, or for other uses. Classification decisions may be initiated by petition, pt. 2450, or by the BLM itself, pt. 2460. Regulations pro-

mulgated by the Secretary prescribe the procedures to be followed in the case of each type of classification determination.

## II

In its complaint, respondent averred generally that the reclassification of some withdrawn lands and the return of others to the public domain would open the lands up to mining activities, thereby destroying their natural beauty. Respondent alleged that petitioners, in the course of administering the Nation's public lands, had violated the FLPMA by failing to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands," 43 U. S. C. § 1712(a) (1982 ed.); failing to submit recommendations as to withdrawals in the 11 Western States to the President, § 1714(*l*); failing to consider multiple uses for the disputed lands, § 1732(a), focusing inordinately on such uses as mineral exploitation and development; and failing to provide public notice of decisions, §§ 1701(a)(5), 1712(c)(9), 1712(f), and 1739(e). Respondent also claimed that petitioners had violated NEPA, which requires federal agencies to "include in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . the environmental impact of the proposed action." 42 U. S. C. § 4332(2)(C) (1982 ed.). Finally, respondent alleged that all of the above actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and should therefore be set aside pursuant to § 10(e) of the APA, 5 U. S. C. § 706. Appended to the amended complaint was a schedule of specific land-status determinations, which the complaint stated had been "taken by defendants since January 1, 1981"; each was identified by a listing in the Federal Register.

In December 1985, the District Court granted respondent's motion for a preliminary injunction prohibiting petitioners from "[m]odifying, terminating or altering any withdrawal, classification, or other designation governing the protection

of lands in the public domain that was in effect on January 1, 1981," and from "[t]aking any action inconsistent" with any such withdrawal, classification, or designation. App. to Pet. for Cert. 185a. In a subsequent order, the court denied petitioners' motion under Rule 12(b) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to demonstrate standing to challenge petitioners' actions under the APA, 5 U. S. C. § 702. App. to Pet. for Cert. 183a. The Court of Appeals affirmed both orders. *National Wildlife Federation* v. *Burford*, 266 U. S. App. D. C. 241, 835 F. 2d 305 (1987). As to the motion to dismiss, the Court of Appeals found sufficient to survive the motion the general allegation in the amended complaint that respondent's members used environmental resources that would be damaged by petitioners' actions. See *id.*, at 248, 835 F. 2d, at 312. It held that this allegation, fairly read along with the balance of the complaint, both identified particular land-status actions that respondent sought to challenge—since at least some of the actions complained of were listed in the complaint's appendix of Federal Register references—and asserted harm to respondent's members attributable to those particular actions. *Id.*, at 249, 835 F. 2d, at 313. To support the latter point, the Court of Appeals pointed to the affidavits of two of respondent's members, Peggy Kay Peterson and Richard Erman, which claimed use of land "in the vicinity" of the land covered by two of the listed actions. Thus, the Court of Appeals concluded, there was "concrete indication that [respondent's] members use specific lands covered by the agency's Program and will be adversely affected by the agency's actions," and the complaint was "sufficiently specific for purposes of a motion to dismiss." *Ibid.* On petitions for rehearing, the Court of Appeals stood by its denial of the motion to dismiss and directed the parties and the District Court "to proceed with this litigation with dispatch." *National Wildlife Federation* v. *Burford*, 269 U. S. App. D. C. 271, 272, 844 F. 2d 889, 890 (1988).

Back before the District Court, petitioners again claimed, this time by means of a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure (which motion had been outstanding during the proceedings before the Court of Appeals), that respondent had no standing to seek judicial review of petitioners' actions under the APA. After argument on this motion, and in purported response to the court's postargument request for additional briefing, respondent submitted four additional member affidavits pertaining to the issue of standing. The District Court rejected them as untimely, vacated the injunction, and granted the Rule 56 motion to dismiss. It noted that neither its earlier decision nor the Court of Appeals' affirmance controlled the question, since both pertained to a motion under Rule 12(b). It found the Peterson and Erman affidavits insufficient to withstand the Rule 56 motion, even as to judicial review of the particular classification decisions to which they pertained. And even if they had been adequate for that limited purpose, the court said, they could not support respondent's attempted APA challenge to "each of the 1250 or so individual classification terminations and withdrawal revocations" effected under the land withdrawal review program. *National Wildlife Federation* v. *Burford*, 699 F. Supp. 327, 332 (DC 1988).

This time the Court of Appeals reversed. *National Wildlife Federation* v. *Burford*, 278 U. S. App. D. C. 320, 878 F. 2d 422 (1989). It both found the Peterson and Erman affidavits sufficient in themselves and held that it was an abuse of discretion not to consider the four additional affidavits as well.[1] The Court of Appeals also concluded that

---

[1] As an additional basis for its conclusion, the Court of Appeals held that the earlier panel's finding that the Peterson and Erman affidavits were sufficient to establish respondent's right to sue was the "law of the case." We do not address this conclusion, as the earlier panel's ruling does not, of course, bind this Court. *Messenger* v. *Anderson*, 225 U. S. 436, 444 (1912).

standing to challenge individual classification and withdrawal decisions conferred standing to challenge all such decisions under the land withdrawal review program. We granted certiorari. 493 U. S. 1042 (1990).

### III

### A

We first address respondent's claim that the Peterson and Erman affidavits alone suffice to establish respondent's right to judicial review of petitioners' actions. Respondent does not contend that either the FLPMA or NEPA provides a private right of action for violations of its provisions. Rather, respondent claims a right to judicial review under § 10(a) of the APA, which provides:

> "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U. S. C. § 702.

This provision contains two separate requirements. First, the person claiming a right to sue must identify some "agency action" that affects him in the specified fashion; it is judicial review "thereof" to which he is entitled. The meaning of "agency action" for purposes of § 702 is set forth in 5 U. S. C. § 551(13), see 5 U. S. C. § 701(b)(2) ("For the purpose of this chapter . . . 'agency action' ha[s] the meanin[g] given . . . by section 551 of this title"), which defines the term as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U. S. C. § 551(13). When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the "agency action" in question must be "final agency action." See 5 U. S. C. § 704 ("Agency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review" (emphasis added).

Second, the party seeking review under § 702 must show that he has "suffer[ed] legal wrong" because of the challenged agency action, or is "adversely affected or aggrieved" by that action "within the meaning of a relevant statute." Respondent does not assert that it has suffered "legal wrong," so we need only discuss the meaning of "adversely affected or aggrieved . . . within the meaning of a relevant statute." As an original matter, it might be thought that one cannot be "adversely affected or aggrieved *within the meaning*" of a statute unless the statute in question uses those terms (or terms like them)—as some pre-APA statutes in fact did when conferring rights of judicial review. See, *e. g.*, Federal Communications Act of 1934, § 402(b)(2), 48 Stat. 1093, as amended, 47 U. S. C. § 402(b)(6) (1982 ed.). We have long since rejected that interpretation, however, which would have made the judicial review provision of the APA no more than a restatement of pre-existing law. Rather, we have said that to be "adversely affected or aggrieved . . . within the meaning" of a statute, the plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. See *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388, 396–397 (1987). Thus, for example, the failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning" of the statute.

## B

Because this case comes to us on petitioners' motion for summary judgment, we must assess the record under the

standard set forth in Rule 56 of the Federal Rules of Civil Procedure. Rule 56(c) states that a party is entitled to summary judgment in his favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(e) further provides:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

As we stated in *Celotex Corp.* v. *Catrett*, 477 U. S. 317 (1986), "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*, at 322. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*, at 323.

These standards are fully applicable when a defendant moves for summary judgment, in a suit brought under § 702, on the ground that the plaintiff has failed to show that he is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." The burden is on the party seeking review under § 702 to set forth specific facts (even though they may be controverted by the Government) showing that he has satisfied its terms. *Sierra Club* v. *Morton*,

405 U. S. 727, 740 (1972). *Celotex* made clear that Rule 56 does not require the moving party to *negate* the elements of the nonmoving party's case; to the contrary, "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." 477 U. S., at 323.

## C

We turn, then, to whether the specific facts alleged in the two affidavits considered by the District Court raised a genuine issue of fact as to whether an "agency action" taken by petitioners caused respondent to be "adversely affected or aggrieved . . . within the meaning of a relevant statute." We assume, since it has been uncontested, that the allegedly affected interests set forth in the affidavits—"recreational use and aesthetic enjoyment"—are sufficiently related to the purposes of respondent association that respondent meets the requirements of § 702 if any of its members do. *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333 (1977).

As for the "agency action" requirement, we think that each of the affidavits can be read, as the Court of Appeals believed, to complain of a particular "agency action" as that term is defined in § 551. The parties agree that the Peterson affidavit, judging from the geographic area it describes, must refer to that one of the BLM orders listed in the appendix to the complaint that appears at 49 Fed. Reg. 19904–19905 (1984), an order captioned W–6228 and dated April 30, 1984, terminating the withdrawal classification of some 4,500 acres of land in that area. See, *e. g.*, Brief for Petitioners 8–10. The parties also appear to agree, on the basis of similar deduction, that the Erman affidavit refers to the BLM order listed in the appendix that appears at 47 Fed. Reg. 7232–7233

(1982), an order captioned Public Land Order 6156 and dated February 18, 1982.

We also think that whatever "adverse effect" or "aggrievement" is established by the affidavits was "within the meaning of the relevant statute"—*i. e.*, met the "zone of interests" test. The relevant statute, of course, is the statute whose violation is the gravamen of the complaint—both the FLPMA and NEPA. We have no doubt that "recreational use and aesthetic enjoyment" are among the *sorts* of interests those statutes were specifically designed to protect. The only issue, then, is whether the facts alleged in the affidavits showed that those interests *of Peterson and Erman* were actually affected.

The Peterson affidavit averred:

> "My recreational use and aesthetic enjoyment of federal lands, particularly those in the vicinity of South Pass-Green Mountain, Wyoming have been and continue to be adversely affected in fact by the unlawful actions of the Bureau and the Department. In particular, the South Pass-Green Mountain area of Wyoming has been opened to the staking of mining claims and oil and gas leasing, an action which threatens the aesthetic beauty and wildlife habitat potential of these lands." App. to Pet. for Cert. 191a.

Erman's affidavit was substantially the same as Peterson's, with respect to all except the area involved; he claimed use of land "in the vicinity of Grand Canyon National Park, the Arizona Strip (Kanab Plateau), and the Kaibab National Forest." *Id.*, at 187a.

The District Court found the Peterson affidavit inadequate for the following reasons:

> "Peterson . . . claims that she uses federal lands *in the vicinity* of the South Pass-Green Mountain area of Wyoming for recreational purposes and for aesthetic enjoyment and that her recreational and aesthetic enjoyment

has been and continues to be adversely affected as the result of the decision of BLM to open it to the staking of mining claims and oil and gas leasing. . . . This decision [W–6228] opened up to mining approximately 4500 acres within a two million acre area, the balance of which, with the exception of 2000 acres, has always been open to mineral leasing and mining. . . . There is no showing that Peterson's recreational use and enjoyment extends to the particular 4500 acres covered by the decision to terminate classification to the remainder of the two million acres affected by the termination. All she claims is that she uses lands 'in the vicinity.' The affidavit on its face contains only a bare allegation of injury, and fails to show specific facts supporting the affiant's allegation." 699 F. Supp., at 331 (emphasis in original).

The District Court found the Erman affidavit "similarly flawed."

"The magnitude of Erman's claimed injury stretches the imagination. . . . [T]he Arizona Strip consists of all lands in Arizona north and west of the Colorado River on approximately 5.5 million acres, an area one-eighth the size of the State of Arizona. Furthermore, virtually the entire Strip is and for many years has been open to uranium and other metalliferous mining. The revocation of withdrawal [in Public Land Order 6156] concerned only non-metalliferous mining in the western one-third of the Arizona Strip, an area possessing no potential for non-metalliferous mining." Id., at 332.

The Court of Appeals disagreed with the District Court's assessment as to the Peterson affidavit (and thus found it unnecessary to consider the Erman affidavit) for the following reason:

"If Peterson was not referring to lands in this 4500-acre affected area, her allegation of impairment to her use and enjoyment would be meaningless, or perjurious. . . .

[T]he trial court overlooks the fact that unless Peterson's language is read to refer to the lands affected by the Program, the affidavit is, at best, a meaningless document.

"At a minimum, Peterson's affidavit is ambiguous regarding whether the adversely affected lands are the ones she uses. When presented with ambiguity on a motion for summary judgment, a District Court must resolve any factual issues of controversy in favor of the non-moving party . . . . This means that the District Court was obliged to resolve any factual ambiguity in favor of NWF, and would have had to assume, for the purposes of summary judgment, that Peterson used the 4500 affected acres." 278 U. S. App. D. C., at 329, 878 F. 2d, at 431.

That is not the law. In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Cf. *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 249 (1986) ("[T]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint'"), quoting *First National Bank of Ariz.* v. *Cities Service Co.*, 391 U. S. 253, 290 (1968). Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one

sworn averment of that fact before the lengthy process of litigation continues.

At the margins there is some room for debate as to how "specific" must be the "specific facts" that Rule 56(e) requires in a particular case. But where the fact in question is the one put in issue by the § 702 challenge here—whether one of respondent's members has been, or is threatened to be, "adversely affected or aggrieved" by Government action—Rule 56(e) is assuredly not satisfied by averments which state only that one of respondent's members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action. It will not do to "presume" the missing facts because without them the affidavits would not establish the injury that they generally allege. That converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegation of injury; defendant contests through Rule 56 existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims it is).

Respondent places great reliance, as did the Court of Appeals, upon our decision in *United States* v. *Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U. S. 669 (1973). The *SCRAP* opinion, whose expansive expression of what would suffice for § 702 review under its particular facts has never since been emulated by this Court, is of no relevance here, since it involved not a Rule 56 motion for summary judgment but a Rule 12(b) motion to dismiss on the pleadings. The latter, unlike the former, presumes that general allegations embrace those specific facts that are necessary to support the claim. *Conley* v. *Gibson*, 355 U. S. 41, 45–46 (1957).

## IV

We turn next to the Court of Appeals' alternative holding that the four additional member affidavits proffered by respondent in response to the District Court's briefing order established its right to § 702 review of agency action.

### A

It is impossible that the affidavits would suffice, as the Court of Appeals held, to enable respondent to challenge the entirety of petitioners' so-called "land withdrawal review program." That is not an "agency action" within the meaning of § 702, much less a "final agency action" within the meaning of § 704. The term "land withdrawal review program" (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA. It is no more an identifiable "agency action"—much less a "final agency action"—than a "weapons procurement program" of the Department of Defense or a "drug interdiction program" of the Drug Enforcement Administration. As the District Court explained, the "land withdrawal review program" extends to, currently at least, "1250 or so individual classification terminations and withdrawal revocations." 699 F. Supp., at 332.[2]

---

[2] Contrary to the apparent understanding of the dissent, we do not contend that no "land withdrawal review program" exists, any more than we would contend that no weapons procurement program exists. We merely assert that it is not an identifiable "final agency action" for purposes of the APA. If there is in fact some specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations, and if that order or regulation is final, and has become ripe for review in the manner we discuss subsequently in

Respondent alleges that violation of the law is rampant within this program—failure to revise land use plans in proper fashion, failure to submit certain recommendations to Congress, failure to consider multiple use, inordinate focus upon mineral exploitation, failure to provide required public notice, failure to provide adequate environmental impact statements. Perhaps so. But respondent cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, respondent must direct its attack against some particular "agency action" that causes it harm. Some statutes permit broad regulations to serve as the "agency action," and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt. Absent such a provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him. (The major exception, of course, is a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately. Such agency action is "ripe" for review at once, whether or not explicit statutory review apart from the APA is provided. See *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 152–154 (1967); *Gardner* v. *Toilet Goods Assn., Inc.*, 387 U. S. 167, 171–173 (1967). Cf. *Toi-*

text, it can of course be challenged under the APA by a person adversely affected—and the entire "land withdrawal review program," insofar as the content of that particular action is concerned, would thereby be affected. But that is quite different from permitting a generic challenge to all aspects of the "land withdrawal review program," as though that itself constituted a final agency action.

*let Goods Assn., Inc.* v. *Gardner,* 387 U. S. 158, 164–166 (1967).)

In the present case, the individual actions of the BLM identified in the six affidavits can be regarded as rules of general applicability (a "rule" is defined in the APA as agency action of "general or particular applicability *and future effect,*" 5 U. S. C. § 551(4) (emphasis added)) announcing, with respect to vast expanses of territory that they cover, the agency's intent to grant requisite permission for certain activities, to decline to interfere with other activities, and to take other particular action if requested. It may well be, then, that even those individual actions will not be ripe for challenge until some further agency action or inaction more immediately harming the plaintiff occurs.[3] But it is at least entirely

---

[3] Under the Secretary's regulations, any person seeking to conduct mining operations that will "cause a cumulative surface disturbance" of five acres or more must first obtain approval of a plan of operations. 43 CFR § 3809.1–4 (1988). Mining operations that cause surface disturbance of less than five acres do not require prior approval, but prior notice must be given to the district office of the BLM. § 3809.1–3. Neither approval nor notification is required only with respect to "casual use operations," § 3809.1–2, defined as "activities ordinarily resulting in only negligible disturbance of the Federal lands and resources," § 3809.0–5. (Activities are considered "casual" if "they do not involve the use of mechanized earth moving equipment or explosives or do not involve the use of motorized vehicles in areas designated as closed to off-road vehicles . . . ." *Ibid.*) Thus, before any mining use ordinarily involving more than "negligible disturbance" can take place, there must occur either agency action in response to a submitted plan or agency inaction in response to a submitted notice.

In one of the four new affidavits, Peggy Peterson, one of the original affiants, states that a corporation has filed a mine permit application with the BLM covering a portion of the land to which her original affidavit pertained. App. to Brief in Opposition for Respondent National Wildlife Federation 16. If that permit is granted, there is no doubt that agency action ripe for review will have occurred; nor any doubt that, in the course of an otherwise proper court challenge, affiant Peterson, and through her respondent, would be able to call into question the validity of the classification order authorizing the permit. However, before the grant of such a permit, or (when it will suffice) the filing of a notice to engage in mining

certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members.[4]

---

activities, or (when only "negligible disturbance" will occur) actual mining of the land, it is impossible to tell where or whether mining activities will occur. Indeed, it is often impossible to tell from a classification order alone whether mining activities will even be permissible. As explained in the uncontested affidavit of the BLM's Assistant Director of Land Resources:

"The lands may be subject to another withdrawal of comparable scope or they may be subject to classification segregations tantamount to such a withdrawal. In that case, the lands would not be opened to the operation of the public land laws so that the removal of one of the withdrawals has no practical effect. Another reason why there may not be any change is that before the revocation occurred, the lands may have been transferred into private ownership. Consequently, the withdrawal revocation amounts to nothing more than a paper transaction . . . . In the alternative, a revoked withdrawal may open the lands to the operation of the public land and mineral laws. . . . Some withdrawal revocations are made without prior knowledge as to what subsequent disposition may be made of the lands. After the lands are opened, they might be transferred out of federal ownership by sale, exchange, or some other discretionary mode of disposal, not anticipated when the withdrawal was revoked. These subsequent discretionary actions require separate and independent decisionmaking that, obviously, are divorced from the prior revocation decision. Environmental and other management concerns and public participation are taken into account in relation to the post-revocation decisionmaking." Affidavit of Frank Edwards, Aug. 18, 1985, App. 61–62.

[4] Nothing in this is contrary to our opinion in *Automobile Workers* v. *Brock*, 477 U. S. 274 (1986), cited by the Court of Appeals. That opinion did not discuss, and the respondent Secretary of Labor did not rely upon, the requirements of 5 U. S. C. § 702 and our ripeness jurisprudence in cases such as *Abbott Laboratories* v. *Gardner*, 387 U. S. 136 (1967); *Gardner* v. *Toilet Goods Assn., Inc.*, 387 U. S. 167 (1967); and *Toilet Goods Assn., Inc.* v. *Gardner*, 387 U. S. 158 (1967). The only challenge made and decided, with respect to the individuals' right to sue, relied upon 19 U. S. C. § 2311(d) (1982 ed.), which according to the Secretary of Labor made entertainment of that suit "'contrary to Congress's incorporation of

The case-by-case approach that this requires is understandably frustrating to an organization such as respondent, which has as its objective across-the-board protection of our Nation's wildlife and the streams and forests that support it. But this is the traditional, and remains the normal, mode of operation of the courts. Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific "final agency action" has an actual or immediately threatened effect. *Toilet Goods Assn.*, 387 U. S., at 164–166. Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole "program" to be revised by the agency in order to avoid the unlawful result that the court discerns. But it is assuredly not as swift or as immediately far-reaching a corrective process as those interested in systemic improvement would desire. Until confided to us, however, more sweeping actions are for the other branches.

## B

The Court of Appeals' reliance upon the supplemental affidavits was wrong for a second reason: The District Court did not abuse its discretion in declining to admit them. Petitioners filed their motion for summary judgment in September 1986; respondent filed an opposition but did not submit any new evidentiary materials at that time. On June 27, 1988, after the case had made its way for the first time through the Court of Appeals, the District Court announced that it would hold a hearing on July 22 on "the outstanding motions for summary judgment," which included petitioners' motion challenging respondent's § 702 standing. The hearing was held and, as noted earlier, the District Court issued an order directing respondent to file "a supplemental memorandum re-

---

the state system into the administration of the Trade Act, and an affront to the integrity and authority of the state courts.'" 477 U. S., at 283, quoting Brief for Respondent in *Automobile Workers*, O. T. 1985, No. 84–1777, p. 16.

garding the issue of its standing to proceed." Record, Doc. No. 274. Although that plainly did not call for the submission of new evidentiary materials, it was in purported response to this order, on August 22, 1988, that respondent submitted (along with the requested legal memorandum) the additional affidavits. The only explanation for the submission (if it can be called an explanation) was contained in a footnote to the memorandum, which simply stated that "NWF now has submitted declarations on behalf of other members of NWF who have been injured by the challenged actions of federal defendants." Record, Doc. No. 278, p. 18, n. 21. In its November 4, 1988, ruling granting petitioners' motion, the District Court rejected the additional affidavits as "untimely and in violation of [the court's briefing] Order." 699 F. Supp., at 328, n. 3.

Respondent's evidentiary submission was indeed untimely, both under Rule 56, which requires affidavits in opposition to a summary judgment motion to be served "prior to the day of the hearing," Fed. Rule Civ. Proc. 56(c), and under Rule 6(d), which states more generally that "[w]hen a motion is supported by affidavit, . . . opposing affidavits may be served not later than 1 day before the hearing, unless the court permits them to be served at some other time." Rule 6(b) sets out the proper approach in the case of late filings:

> "When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect . . . ."

This provision not only specifically confers the "discretion" relevant to the present issue, but also provides the mecha-

nism by which that discretion is to be invoked and exercised. First, any extension of a time limitation must be "for cause shown." Second, although extensions before expiration of the time period may be "with or without motion or notice," any *post*deadline extension must be "upon motion made," and is permissible only where the failure to meet the deadline "was the result of excusable neglect." Thus, in order to receive the affidavits here, the District Court would have had to regard the very filing of the late document as the "motion made" to file it;[5] it would have had to interpret "cause

---

[5] The dissent asserts that a footnote in respondent's reply memorandum to the District Court was a "motion" within the meaning of Rule 6(b)(2), and was so obviously so that the District Court committed reversible error in failing to construe it that way. *Post*, at 909–910, n. 10. We cannot agree. Rule 6(b) establishes a clear distinction between "requests" and "motions," and the one cannot be converted into the other without violating its provisions—or at least cannot be converted on the basis of such lax criteria that conversion would be not only marginally permissible but positively mandatory in the present case. Rule 6(b)(1) allows a court ("for cause shown" and "in its discretion") to grant a "request" for an extension of time, whether the request is made "with or without motion or notice," *provided* the request is made before the time for filing expires. *After* the time for filing has expired, however, the court (again "for cause shown" and "in its discretion") may extend the time only "upon motion." To treat all postdeadline "requests" as "motions" (if indeed any of them can be treated that way) would eliminate the distinction between predeadline and postdeadline filings that the Rule painstakingly draws. Surely the postdeadline "request," to be even *permissibly* treated as a "motion," must contain a high degree of formality and precision, putting the opposing party on notice that a motion is at issue and that he therefore ought to respond. The request here had not much of either characteristic. As for formality, it was not even made in a separate filing or in a separate appearance before the court, but was contained in a single sentence at the end of the first paragraph of one of the 18 single-spaced footnotes in a 20-page memorandum of law. Our district judges must read footnotes with new care if they are to be reversed for failing to recognize motions buried in this fashion. And as for precision, the request not only did not ask for any *particular* extension of time (7 days, 30 days), it did not specifically ask for an extension of time *at all*, but merely said that respondent "should be given adequate opportunity to supplement the record." Even this, moreover,

shown" to mean merely "cause," since respondent made no "showing" of cause at all; and finally, it would have had to find as a substantive matter that there was indeed "cause" for the late filing, and that the failure to file on time "was the result of excusable neglect."

This last substantive obstacle is the greatest of all. The Court of Appeals presumably thought it was overcome because "the papers on which the trial court relied were two years old by the time it requested supplemental memoranda" and because "there was no indication prior to the trial court's request that [respondent] should have doubted the adequacy of the affidavits it had already submitted." 278 U. S. App. D. C., at 331, 878 F. 2d, at 433. We do not understand the relevance of the first point; the passage of so long a time as two years suggests, if anything, that respondent had more than the usual amount of time to prepare its response to the motion, and was more than moderately remiss in waiting until after the last moment. As to the suggestion of unfair surprise: A litigant is never justified in assuming that the court has made up its mind until the court expresses itself to that effect, and a litigant's failure to buttress its position because of confidence in the strength of that position is always indulged in at the litigant's own risk. In any case, whatever erroneous expectations respondent may have had were surely dispelled by the District Court's order in June 1988 announcing that the hearing on petitioners' motion would be held one month later. At least when that order issued, respondent was on notice that its right to sue was at issue, and that (absent proper motion) the time for filing any additional evidentiary materials was, at the latest, the day before the hearing.

---

was not requested (much less moved for) unconditionally, but only "[i]f the court intends to reverse its prior ruling [regarding NWF standing]." Record, Doc. No. 294, p. 17, n. 16. We think it quite impossible to agree with the dissent that the District Judge not only *might* treat this request as a motion, but that he was compelled to do so.

Perhaps it is true that the District Court could have overcome all the obstacles we have described—apparent lack of a motion, of a showing, and of excusable neglect—to admit the affidavits at issue here. But the proposition that it was *compelled* to receive them—that it was an abuse of discretion to *reject* them—cannot be accepted.

## V

Respondent's final argument is that we should remand this case for the Court of Appeals to decide whether respondent may seek § 702 review of petitioners' actions in its own right, rather than derivatively through its members. Specifically, it points to allegations in the amended complaint that petitioners unlawfully failed to publish regulations, to invite public participation, and to prepare an environmental impact statement with respect to the "land withdrawal review program" as a whole. In order to show that it is a "person . . . adversely affected or aggrieved" by these failures, it submitted to the District Court a brief affidavit (two pages in the record) by one of its vice presidents, Lynn A. Greenwalt, who stated that respondent's mission is to "inform its members and the general public about conservation issues" and to advocate improvements in laws and administrative practices "pertaining to the protection and enhancement of federal lands," App. to Pet. for Cert. 193a–194a; and that its ability to perform this mission has been impaired by petitioners' failure "to provide adequate information and opportunities for public participation with respect to the Land Withdrawal Review Program." *Id.*, at 194a. The District Court found this affidavit insufficient to establish respondent's right to seek judicial review, since it was "conclusory and completely devoid of specific facts." 699 F. Supp., at 330. The Court of Appeals, having reversed the District Court on the grounds discussed above, did not address the issue.

We agree with the District Court's disposition. Even assuming that the affidavit set forth "specific facts," Fed. R.

Civ. Proc. 56(e), adequate to show injury to respondent through the deprivation of information; and even assuming that providing information to organizations such as respondent was one of the objectives of the statutes allegedly violated, so that respondent is "aggrieved within the meaning" of those statutes; nonetheless, the Greenwalt affidavit fails to identify any particular "agency action" that was the source of these injuries. The only sentences addressed to that point are as follows:

> "NWF"s ability to meet these obligations to its members has been significantly impaired by the failure of the Bureau of Land Management and the Department of the Interior to provide adequate information and opportunities for public participation with respect to the Land Withdrawal Review Program. These interests of NWF have been injured by the actions of the Bureau and the Department and would be irreparably harmed by the continued failure to provide meaningful opportunities for public input and access to information regarding the Land Withdrawal Review Program." App. to Pet. for Cert. 194a.

As is evident, this is even more deficient than the Peterson and Erman affidavits, which contained geographical descriptions whereby at least an action as general as a particular classification decision could be identified as the source of the grievance. As we discussed earlier, the "land withdrawal review program" is not an identifiable action or event. With regard to alleged deficiencies in providing information and permitting public participation, as with regard to the other illegalities alleged in the complaint, respondent cannot demand a general judicial review of the BLM's day-to-day operations. The Greenwalt affidavit, like the others, does not set forth the specific facts necessary to survive a Rule 56 motion.

* * *

For the foregoing reasons, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

In my view, the affidavits of Peggy Kay Peterson and Richard Loren Erman, in conjunction with other record evidence before the District Court on the motions for summary judgment, were sufficient to establish the standing of the National Wildlife Federation (Federation or NWF) to bring this suit. I also conclude that the District Court abused its discretion by refusing to consider supplemental affidavits filed after the hearing on the parties' cross-motions for summary judgment. I therefore would affirm the judgment of the Court of Appeals.

I

The Federation's asserted injury in this case rested upon its claim that the Government actions challenged here would lead to increased mining on public lands; that the mining would result in damage to the environment; and that the recreational opportunities of NWF's members would consequently be diminished. Abundant record evidence supported the Federation's assertion that on lands newly opened for mining, mining in fact would occur.[1] Similarly, the record furnishes ample support for NWF's contention that mining activities can be expected to cause severe environ-

---

[1] Prior to the District Court's entry of the preliminary injunction, 406 mining claims had been staked in the South Pass-Green Mountain area alone. App. 119. An exhibit filed by the federal parties indicated that over 7,200 claims had been filed in 12 Western States. Exh. 1 to Affidavit of Joseph Martyak (Apr. 11, 1986).

mental damage to the affected lands.[2] The District Court held, however, that the Federation had not adequately identified particular members who were harmed by the consequences of the Government's actions. Although two of NWF's members expressly averred that their recreational activities had been impaired, the District Court concluded that these affiants had not identified with sufficient precision the particular sites on which their injuries occurred. The majority, like the District Court, holds that the averments of Peterson and Erman were insufficiently specific to withstand a motion for summary judgment. Although these affidavits were not models of precision, I believe that they were adequate at least to create a genuine issue of fact as to the organization's injury.

---

[2] A Bureau of Land Management (BLM) draft of a Resource Management Plan/Environmental Impact Statement for the Lander, Wyo., Resource Area stated: "In the Green Mountain Management Unit . . . significant long-term impacts to elk and mule deer herds could occur from habitat losses caused by oil and gas activities over the next 60 years. . . . In the South Pass Management Unit, significant acreages of lodgepole pine forest and aspen conifer woodland habitat types could be disturbed, which would cause significant long-term impacts to moose and elk. . . . If gold mining activities continued to erode these high-value habitats, trout fisheries, the Lander moose herd, the beaver pond ecosystems, and the populations of many other wildlife species would suffer significant cumulative negative effects." Draft RMP/EIS, pp. 226–228 (Exh. 3 to Defendant-Intervenors' Reply to Plaintiff's Opposition to Defendants' Motions for Stay Pending Appeal (May 14, 1986)).

A BLM Mineral Report issued June 17, 1982, concluded that mining and associated activities "could have an adverse impact on crucial moose habitat, deer habitat, some elk habitat, and a variety of small game and bird species. Improvements at campgrounds, as well as land in the immediate vicinity, could either be damaged or destroyed. These activities could make it difficult for the BLM to manage the forest production and harvesting in the South Pass area. Historical and cultural resources which have and have not been identified could be either damaged or destroyed." Defendant-Intervenors' Exh. 7 (attached as Appendix 1 to Plaintiff National Wildlife Federation's Statement of Points and Authorities in Support of Its Standing To Proceed (Aug. 22, 1988)).

As the Court points out, the showing (whether as to standing or the merits) required to overcome a motion for summary judgment is more extensive than that required in the context of a motion to dismiss. The principal difference is that in the former context *evidence* is required, while in the latter setting the litigant may rest upon the allegations of his complaint. See *Celotex Corp.* v. *Catrett,* 477 U. S. 317, 324 (1986) (Federal Rule of Civil Procedure 56(e) "requires the nonmoving party to go beyond the pleadings"). In addition, Rule 56(e) requires that the party opposing summary judgment "must set forth *specific* facts showing that there is a genuine issue for trial" (emphasis added). Thus, Courts of Appeals have reiterated that "conclusory" allegations unsupported by "specific" evidence will be insufficient to establish a genuine issue of fact.[3]

The requirement that evidence be submitted is satisfied here: The Federation has offered the sworn statements of two of its members. There remains the question whether the allegations in these affidavits were sufficiently precise to satisfy the requirements of Rule 56(e). The line of demarcation between "specific" and "conclusory" allegations is hardly a bright one. But, to my mind, the allegations contained in the Peterson and Erman affidavits, in the context of the record as a whole, were adequate to defeat a motion for summary judgment. These affidavits, as the majority acknowledges, were at least sufficiently precise to enable Bureau of Land Management (BLM) officials to identify the particular termination orders to which the affiants referred. See *ante,* at 885–886. And the affiants averred that their "recreational use and aesthetic enjoyment of federal lands . . . have been and continue to be adversely affected in fact by the unlawful

---

[3] See, *e. g., May* v. *Department of Air Force,* 777 F. 2d 1012, 1016 (CA5 1985); *First Commodity Traders, Inc.* v. *Heinold Commodities, Inc.,* 766 F. 2d 1007, 1011 (CA7 1985); *Maldonado* v. *Ramirez,* 757 F. 2d 48, 51 (CA3 1985); *Galindo* v. *Precision American Corp.,* 754 F. 2d 1212, 1216 (CA5 1985).

actions of the Bureau and the Department." App. to Pet. for Cert. 188a (Erman affidavit), 191a (Peterson affidavit). The question, it should be emphasized, is not whether the NWF has *proved* that it has standing to bring this action, but simply whether the materials before the District Court established "that there is a genuine issue for trial," see Rule 56(e), concerning the Federation's standing. In light of the principle that "[o]n summary judgment the inferences to be drawn from the underlying facts contained in [evidentiary] materials must be viewed in the light most favorable to the party opposing the motion," *United States* v. *Diebold, Inc.*, 369 U. S. 654, 655 (1962), I believe that the evidence before the District Court raised a genuine factual issue as to NWF's standing to sue.

No contrary conclusion is compelled by the fact that Peterson alleged that she uses federal lands "in the vicinity of South Pass-Green Mountain, Wyoming," App. to Pet. for Cert. 191a, rather than averring that she uses the precise tract that was recently opened to mining. The agency itself has repeatedly referred to the "South Pass-Green Mountain area" in describing the region newly opened to mining.[4] Peterson's assertion that her use and enjoyment of federal lands *have been* adversely affected by the agency's decision to permit more extensive mining is, as the Court of Appeals stated, *National Wildlife Federation* v. *Burford*, 278 U. S. App. D. C. 320, 329, 878 F. 2d 422, 431 (1989), "meaningless, or perjurious" if the lands she uses do not include those harmed by mining undertaken pursuant to termination order W–6228.[5] To read particular assertions within the affidavit in light of the document as a whole is, as the majority might put it, "a world apart" from "presuming" facts that are neither stated nor implied simply because without them the

[4] See, *e. g.*, App. 123–139 (declaration of Jack Kelly).

[5] The areas harmed or threatened by mining and associated activities may extend well beyond the precise location where mining occurs. See n. 2, *supra*.

plaintiff would lack standing. The Peterson and Erman affidavits doubtless could have been more artfully drafted, but they definitely were sufficient to withstand the federal parties' summary judgment motion.

## II

I also conclude that the District Court abused its discretion in refusing to consider the supplemental affidavits filed by NWF after the hearing on the summary judgment motion.[6] The court's decision abruptly derailed the Federation's lawsuit after three years of proceedings involving massive time and expense. The District Court and Court of Appeals both had concluded that NWF's claims were sufficiently substantial to warrant the entry of a nationwide injunction. Whatever the ultimate merits of the Federation's claims, litigation of this magnitude should not be aborted on technical grounds if that result legitimately can be avoided. The majority's approach reflects an insufficient appreciation both of the realities of complex litigation and of the admonition that the Federal Rules of Civil Procedure "shall be construed to secure

---

[6] Five supplemental affidavits were filed. The first was submitted by Peggy Kay Peterson, in clarification of her earlier affidavit: "A substantial portion of the lands which I use . . . are identical to those lands" newly opened to mining in the South Pass-Green Mountain area. Peterson Supplemental Affidavit, App. in No. 88–5397 (CADC), p. 356. Ms. Peterson also asserted that "U. S. Energy Corporation has filed a mine permit application with the Bureau and Department, (U. S. Energy Application, TFN 2 4/86), which includes a proposal to mine a significant portion of the federal lands which I use for recreational purposes and aesthetic enjoyment." *Id.*, at 355–356. The other affiants were NWF members David Doran, Merlin McColm, Stephen Blomeke, and Will Ouellette. These individuals identified termination orders that had opened to mining particular tracts of land used by the affiants for recreation and aesthetic enjoyment.

The federal parties do not concede that the supplemental affidavits established with certainty the Federation's standing; they contend that further discovery might show the affiants' allegations to be untrue. The federal parties do concede, however, that the supplemental affidavits were not facially deficient. Tr. of Oral Arg. 19.

the just, speedy, and inexpensive determination of every action." Rule 1.

That a requirement is "technical" does not, of course, mean that it need not be obeyed. And an appeal to the "spirit" of the Federal Rules is an insufficient basis for ignoring the import of their text. If the Rules imposed an absolute deadline for the submission of evidentiary materials, the District Court could not be faulted for strictly enforcing that deadline, even though the result in a particular case might be unfortunate. But, as the Court acknowledges, the Rules expressly permit the District Court to exercise discretion in deciding whether affidavits in opposition to a summary judgment motion may be submitted after the hearing.[7] Once the District Court's *power* to accept untimely affidavits is recognized, the question whether that power should be exercised in a particular instance must be answered by reference to the explanation for the litigant's omission and the purposes the Rules are designed to serve. In my view, NWF showed adequate cause for its failure to file the supplemental affidavits prior to the hearing. Moreover, the organization's untimely filing in no way disserved the purposes of Rule 56(c), and the federal parties suffered no prejudice as a consequence of the

---

[7] Rule 56(c) provides that when a motion for summary judgment is filed, the "adverse party prior to the day of hearing may serve opposing affidavits." Under Rule 56(e), the district court "may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Rule 6(d) states: "When a motion is supported by affidavit, . . . opposing affidavits may be served not later than 1 day before the hearing, unless the court permits them to be served at some other time." The district court's authority to permit service "at some other time" is governed in turn by Rule 6(b), which provides that when an act is required to be performed by a specified time, the district court may "upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." See 4A C. Wright & A. Miller, Federal Practice and Procedure § 1165, p. 475 (2d ed. 1987) (Rule 6(b) "gives the court extensive flexibility to modify the fixed time periods found throughout the rules, whether the enlargement is sought before or after the actual termination of the allotted time").

delay. Under these circumstances, I believe that the District Court's refusal to consider these submissions constituted an abuse of discretion.

The Federal Rules require that affidavits in opposition to a motion ordinarily must be served at least one day prior to the hearing; the Rules provide, however, that the affidavits may be filed at a later time "where the failure to act was the result of excusable neglect." Rule 6(b); see n. 7, *supra*. Prior to the July 22, 1988, hearing on the parties' cross-motions for summary judgment, NWF had been assured repeatedly that its prior submissions were sufficient to establish its standing to sue. In its memorandum opinion granting the Federation's motion for a preliminary injunction, the District Court stated: "We continue to find irreparable injury to plaintiff and reaffirm plaintiff's standing to bring this action." *National Wildlife Federation* v. *Burford*, 676 F. Supp. 280, 281 (DC 1986).

Later that year the federal parties sought additional discovery on the question of standing. NWF sought to quash discovery, arguing that "[t]he Court should bar any additional discovery on this issue because (1) it has already found that plaintiff has standing; (2) plaintiff has already produced affidavits which demonstrate standing and therefore any additional discovery would be unreasonably cumulative, duplicative, burdensome and expensive within the meaning of Rule 26(c)(1); and (3) contrary to the government defendants' apparent theory, plaintiff need not demonstrate injury as to each and every action that is part of the program." Memorandum of Points and Authorities in Support of Plaintiff's Motion To Quash and for a Protective Order 5–6 (July 1, 1986). In the alternative, NWF argued that if additional discovery on standing was to be ordered, it should be confined to the requirement that a limited number of additional affidavits be submitted. *Id.*, at 22. The District Court, on July 14, 1986, granted in full the Federation's motion to quash and ordered "that no further discovery of plaintiff or

its members, officers, employees, agents, servants, or attorneys shall be permitted until subsequent order of this court, if any." App. to Pet. for Cert. 170a–171a. When the District Court's grant of a preliminary injunction was subjected to appellate review, the Court of Appeals concluded that the Peterson and Erman affidavits "provide a concrete indication that the Federation's members use specific lands covered by the agency's Program and will be adversely affected by the agency's actions." *National Wildlife Federation* v. *Burford*, 266 U. S. App. D. C. 241, 249, 835 F. 2d 305, 313 (1987).[8] The majority's statement that "a litigant is never justified in assuming that the court has made up its mind until the court expresses itself to that effect," *ante*, at 897, is therefore simply irrelevant to the present case: The District Court and the Court of Appeals repeatedly had indicated that the Federation had offered sufficient evidence of its standing.

Nor did the District Court's order of June 27, 1988, scheduling a motion hearing for the following July 22, place NWF on notice that its claim of standing might be reconsidered. That order made clear that the hearing would consider the summary judgment motions of both the federal parties and

---

[8] The Court of Appeals' discussion of standing occurred in the context of a motion to dismiss and therefore, by itself, might not assure NWF that it had made a sufficient showing to withstand a motion for summary judgment. But the Court of Appeals, like the District Court before it, also held that the Federation's showing of injury, as reflected in the Peterson and Erman affidavits, provided an adequate basis for a *preliminary injunction.* As the second Court of Appeals panel concluded, "the burden of establishing irreparable harm to support a request for a preliminary injunction is, if anything, at least as great as the burden of resisting a summary judgment motion on the ground that the plaintiff cannot demonstrate 'injury-in-fact.'" *National Wildlife Federation* v. *Burford*, 278 U. S. App. D. C. 320, 330, 878 F. 2d 422, 432 (1989) (emphasis omitted). When the first panel affirmed the District Court's entry of a preliminary injunction, Judge Williams' separate opinion, concurring and dissenting, stated that "the specificity required for standing allegations to secure a preliminary injunction will normally be no less than that required on a motion for summary judgment." 266 U. S. App. D. C., at 264, 835 F. 2d, at 328.

the Federation. The principal submission of the federal parties relevant to the hearing was the Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Motion for Summary Judgment and/or for Dissolution of the Preliminary Injunction Issued on February 10, 1986; that memorandum was filed on September 12, 1986. This 86-page memorandum included only 9½ pages devoted to standing, and half of that discussion set forth the federal parties' claim that no broad programmatic challenge could succeed even if the Peterson and Erman affidavits adequately alleged injury from Government decisions as to particular tracts of land. Moreover, even the attack on the Peterson and Erman affidavits did not purport to show that summary judgment for the federal parties should be entered on the ground that the Federation lacked standing. Rather, the federal parties argued principally that summary judgment *for NWF* would be inappropriate because a genuine factual dispute existed as to the Federation's standing to sue. See Defendants' Memorandum, at 45–47. In fact, the 86-page memorandum included only *two sentences* arguing that the federal parties should be awarded summary judgment on standing grounds. *Id.*, at 11–12, 85. The District Court's decision to schedule a hearing on the parties' cross-motions for summary judgment provided no hint that previous assurances concerning standing were open to reconsideration.[9]

Certainly the Federation *could* have submitted additional evidentiary materials in support of its claim of standing, even though it had no reason to believe that further submissions were necessary. But it would hardly enhance the efficiency

---

[9] At the hearing itself Fred R. Disheroon, the federal parties' attorney, argued at length on other points before turning to the issue of standing. He began that portion of his argument by observing that "perhaps the court doesn't want to hear me argue standing, but I think it is imperative that I address that in the context of this case." Tr. of Motions Hearing 43 (July 22, 1988).

of the adjudicative process to encourage litigants to reargue questions previously settled in their favor. In my view, NWF established sufficient cause for its failure to submit the supplemental affidavits prior to the hearing.[10]

---

[10] The supplemental affidavits were submitted as an attachment to the supplemental legal memorandum on standing requested by the District Court. At the time of their submission, NWF stated only that "NWF now has submitted declarations on behalf of other members of NWF who have been injured by the challenged actions of federal defendants." Plaintiff National Wildlife Federation's Statement of Points and Authorities in Support of Its Standing To Proceed 18, n. 21 (Aug. 22, 1988). However, in its reply memorandum on the issue, NWF addressed the contention of the federal parties and the defendant-intervenor that the affidavits should be ignored as untimely filed. NWF stated: "Plaintiff heretofore, has relied on the court's previous rulings on NWF"s standing. In its motion for a protective order against additional discovery, NWF argued that its standing had already been proven on the basis of the affidavits of Mr. Greenwalt, Ms. Peterson, and Mr. Erman. The court agreed and entered the requested protective order. If the court intends to reverse its prior ruling, then NWF respectfully requests that it should be given adequate opportunity to supplement the record." Plaintiff National Wildlife Federation's Reply Memorandum in Support of Its Standing To Proceed 17, n. 16 (Sept. 14, 1988). The Federation also noted that Circuit precedent permitted the filing of supplemental affidavits on standing issues, even on appeal. *Ibid.*, citing *National Wildlife Federation* v. *Hodel*, 268 U. S. App. D. C. 15, 24, 839 F. 2d 694, 703 (1988). NWF offered the further explanation: "Ms. Peterson has supplemented her affidavit to include new information regarding a mine application which has been filed by U. S. Energy Corporation that includes a proposal to mine lands within the area of South Pass/Green Mountain previously closed to mining. For the record, NWF initially was told by officials of the Bureau of Land Management that the U. S. Energy mine application did not include any lands covered by the court's preliminary injunction. Otherwise, NWF would have supplemented Ms. Peterson's affidavit earlier." Reply Memorandum, at 12–13, n. 13.

Along with its Reply Memorandum, NWF submitted an additional filing entitled Plaintiff National Wildlife Federation's Memorandum in Opposition to Defendant-Intervenors' Motion To Strike Plaintiff's Supplementation of the Record (Sept. 14, 1988). That filing stated: "For the reasons stated in [the reply memorandum] at page 17, n. 16, plaintiff requests that defendant-intervenors' motion to strike be denied." (In light of this sepa-

Moreover, the District Court's refusal to consider the additional submissions in this case did not significantly advance the interests that Rule 56(c) is designed to serve. The Rule requires that affidavits in opposition to a motion for summary judgment must be served "prior to the day of hearing." The Courts of Appeals consistently have recognized, however, that "Rule 56 does not necessarily contemplate an oral hearing. Rather, 10-day advance notice to the adverse party that the motion and all materials in support of or in opposition to the motion will be taken under advisement by the trial court as of a certain day satisfies the notice and hearing

rate submission, addressed solely to the question whether the supplemental affidavits should be considered, and expressly referring to n. 16 of the reply memorandum, it is difficult to fathom the Court's assertion that NWF's request was "buried" in the Federation's filings. See ante, at 896–897, n. 5.) This separate filing, in conjunction with the reply memorandum, satisfied Rule 6(b)'s requirement that the request for enlargement of time be made "upon motion." Though neither of these filings was expressly denominated a "motion," they met the requirements of Rule 7(b): They were submitted in writing, were signed by counsel, "state[d] with particularity the grounds therefor," and unambiguously "set forth the relief . . . sought." See Campos v. LeFevre, 825 F. 2d 671, 676 (CA2 1987) ("[N]o particular form of words is necessary to render a filing a 'motion.' Any submission signed by a party that may fairly be read as a request to the district court to exercise its discretionary powers . . . should suffice"), cert. denied, 484 U. S. 1014 (1988); Smith v. Danyo, 585 F. 2d 83, 86 (CA3 1978) ("Rule 7(b) requires no more than that . . . a motion 'state with particularity the grounds' upon which it is based. Plainly, an affidavit which is filed to obtain an order disqualifying a judge satisfies the requirements of Rule 7(b). . . . The . . . failure to type in the word 'motion' above the word 'affidavit' in no way detracts from the notice which the affidavit gave of the nature of the application"). Cf. Snyder v. Smith, 736 F. 2d 409, 419 (CA7) ("The Federal Rules are to be construed liberally so that erroneous nomenclature in a motion does not bind a party at his peril"), cert. denied, 469 U. S. 1037 (1984); Miller v. Transamerican Press, Inc., 709 F. 2d 524, 527 (CA9 1983) ("The court will construe [a motion], however styled, to be the type proper for the relief requested"); 2A J. Moore & J. Lucas, Moore's Federal Practice ¶7.05, pp. 7–16 to 7–17 (1989) ("[I]t is the motion's substance, and not merely its linguistic form, that determines its nature and legal effect").

dictates of Rule 56." *Moore* v. *Florida*, 703 F. 2d 516, 519 (CA11 1983).[11] Rule 56(c)'s requirement that a summary judgment motion be filed 10 days in advance of a scheduled hearing serves to ensure that the nonmoving party is afforded adequate notice of the motion. Similarly, the requirement that opposing affidavits be submitted prior to the day of the hearing reflects the fact that the district court may rule on the summary judgment motion at the hearing or at any time thereafter; submission of affidavits prior to that day is thus essential if the moving party is to be assured the opportunity to respond at a time when a response is meaningful. The requirement also allows the district court to establish a deadline by which time all evidence and arguments must be submitted; thereafter, the court may deliberate with the assurance that no subsequent filings will alter the terms of the dispute.

These are pressing concerns when the hearing on a summary judgment motion represents the parties' last opportunity to set forth their legal arguments. In the present case, however, the District Court concluded the July 22, 1988, hearing by requesting supplemental briefing on the issue of standing.[12] NWF's supplemental affidavits, filed on August 22 as an attachment to its legal memorandum, were submitted at a time when the federal parties had ample opportunity to respond. (Indeed, the opportunity to respond here—10 days—was far greater than would have been the case if NWF had filed (timely) affidavits the day before the hearing and no

---

[11] Accord, *Allied Chemical Corp.* v. *Mackay*, 695 F. 2d 854, 856 (CA5 1983) ("Rule 56(c) does not require an oral hearing in open court. Rather, it contemplates notice to the party opposing the motion and an adequate opportunity to respond to the movant's arguments"); *Bratt* v. *International Business Machines Corp.*, 785 F. 2d 352, 363 (CA1 1986).

[12] The District Court subsequently established a schedule for the supplemental briefing. NWF was requested to file its opening memorandum by August 22, 1988; the federal parties and intervenors were to file memoranda in opposition by September 1; and NWF's reply was due by September 14. Order of July 27, 1988.

supplemental briefing had been allowed.) The affidavits, moreover, were filed well before the time when the case was to be taken under advisement. The record in this case is voluminous, currently filling six large boxes; consideration of five more affidavits would not have added significantly to the complexity of the issues before the District Court. Under these circumstances, submission of the supplemental affidavits neither disserved the purposes of the Rule nor prejudiced the federal parties in any respect.

The District Court discussed none of these factors in explaining its refusal to consider the supplemental affidavits. Indeed, the District Court offered no justification at all for its action beyond the assertion that the affidavits were untimely.[13] Similarly, the Court today fails to assess the District Court's action by reference to the excuse for NWF's untimely filing or the absence of prejudice to the federal parties. The District Court and today's majority fail to recognize the guiding principle of the Federal Rules of Civil Procedure, the principle that procedural rules should be construed pragmatically, so as to ensure the just and efficient resolution of legal disputes. Some provisions of the Rules strip the district courts of discretion, and the courts have no choice but to enforce these requirements with scrupulous precision.[14] But where the Rules expressly confer a range of

---

[13] The District Court mentioned these affidavits in a single footnote: "Plaintiff, in addition to its memorandum filed August 22, 1988 has submitted additional evidentiary material, including declarations from four of its members. These submissions are untimely and in violation of our Order. We decline to consider them. *See* Federal Defendants' Reply to Plaintiff's Statement of Points and Authorities in Support of Its Standing to Proceed, at 1 n. 1." *National Wildlife Federation* v. *Burford*, 699 F. Supp. 327, 328–329, n. 3 (DC 1988).

[14] Rule 6(b), for example, which generally gives the district court broad authority to grant enlargements of time, establishes the limitation that the court "may not extend the time for taking any action under Rules 50(b) and (c)(2), 52(b), 59(b), (d) and (e), 60(b), and 74(a), except to the extent and under the conditions stated in them."

discretion, a district court may abuse its authority by refusing to take account of equitable concerns, even where its action violates no express command. In my view, such an abuse of discretion occurred here.

## III

In Part IV–A, *ante*, at 890–894, the majority sets forth a long and abstract discussion of the scope of relief that might have been awarded had the Federation made a sufficient showing of injury from environmental damage to a particular tract of land. Since the majority concludes in other portions of its opinion that the Federation lacks standing to challenge *any* of the land-use decisions at issue here, it is not clear to me why the Court engages in the hypothetical inquiry contained in Part IV–A. In any event, I agree with much of the Court's discussion, at least in its general outline. The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." 5 U. S. C. § 702. In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court. On the other hand, if a generally lawful policy is applied in an illegal manner on a particular occasion, one who is injured is not thereby entitled to challenge other applications of the rule.

Application of these principles to the instant case does not turn on whether, or how often, the Bureau's land-management policies have been described as a "program."[15] In one sense,

[15] The term "withdrawal review program" repeatedly has been used in BLM documents. See, *e. g.*, Plaintiff's Exhs. 1, 3, 10, 11, 15, 18, 19 (filed July 15, 1985). At oral argument on the cross-motions for summary judgment, counsel for the federal parties acknowledged: "It is true, BLM referred to this review process as a land withdrawal review program." Tr. of Motion Hearing 40 (July 22, 1988). Counsel went on to say, "but I sug-

of course, there is no question that a "program" exists. Everyone associated with this lawsuit recognizes that the BLM, over the past decade, has attempted to develop and implement a comprehensive scheme for the termination of classifications and withdrawals. The real issue is whether the actions and omissions that NWF contends are illegal are themselves part of a plan or policy. For example: If the agency had published a regulation stating that an environmental impact statement (EIS) should never be developed prior to the termination of a classification or withdrawal, NWF could challenge the regulation (which would constitute an "agency action"). If the reviewing court then held that the statute required a pretermination EIS, the relief (invalidation of the rule) would directly affect tracts other than the ones used by individual affiants. At the other extreme, if the applicable BLM regulation stated that an EIS *must* be developed, and NWF alleged that the administrator in charge of South Pass/Green Mountain had inexplicably failed to develop one, NWF should not be allowed (on the basis of the Peterson affidavit) to challenge a termination in Florida on the ground that an administrator there made the same mistake.

The majority, quoting the District Court, characterizes the Bureau's land management program as "'1250 or so individual classification terminations and withdrawal revocations.'" *Ante,* at 890; see *National Wildlife Federation* v. *Burford,* 699 F. Supp. 327, 332 (DC 1988). The majority offers no argument in support of this conclusory assertion, and I am far from certain that the characterization is an accurate one. Since this issue bears on the scope of the relief ultimately to be awarded should the plaintiff prevail, rather than on the ju-

---

gest that using a word, calling it a program, doesn't make a program in the sense that it is being challenged here." *Ibid.* That assertion, though inelegant, seems essentially correct: An agency's terminology is not decisive in determining whether an alleged illegality is systemic or site-specific.

risdiction of the District Court to entertain the suit, I would allow the District Court to address the question on remand.[16]

## IV

Since I conclude that the Peterson and Erman affidavits provided sufficient evidence of NWF's standing to withstand a motion for summary judgment, and that the District Court abused its discretion by refusing to consider the Federation's supplemental affidavits, I would affirm the judgment of the Court of Appeals. I respectfully dissent.

---

[16] The majority also suggests that the agency actions challenged in this suit may not be ripe for review. See ante, at 891–893. Since the issue of ripeness has not been briefed or argued in this Court, nor passed on by the courts below, I need not address it. I do note, however, that at the outset of this case the federal parties made precisely the opposite argument, asserting that a preliminary injunction should be denied on the ground that NWF's claims were barred by laches. The federal parties contended: "The Federation offers no explanation why, despite its detailed knowledge of BLM's revocation and termination activities, it has waited so long to institute litigation." Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction 26 (Aug. 22, 1985).

I also decline to address the adequacy of the affidavit submitted by Lynn Greenwalt, since the Court of Appeals did not pass on that issue.