Lawrence A. PIERSON

v.

**HALLMARK MARKETING
CORPORATION, et al.**

Civil Action No. 97–341.

United States District Court,
E.D. Pennsylvania.

June 24, 1997.

Nicholas J. Caniglia, Pierce & Caniglia, Wayne, PA, for Plaintiff.

Charles V. Curley, Furman and Halpern, P.C., Bala Cynwyd, PA, Sally B. Surridge, Shelley A. Runion, Blackwell, Sanders, Matheny, Heary & Lombardi, Kansas City, MO, for Defendants.

## MEMORANDUM

NEWCOMER, District Judge.

Presently before this Court are defendants' Motion for Summary Judgment, and plaintiff's response thereto, and defendants' reply thereto. For the following reasons, the Court will grant defendants' Motion. Accordingly, the Court enters judgment in favor of defendants and against plaintiff.

### I. Introduction

#### A. Plaintiff's Retirement

The plaintiff is Lawrence A. Pierson, a former field sales employee of Hallmark Marketing Corporation ("Hallmark Marketing") for thirty-one years. The defendants are Hallmark Marketing, Hallmark Cards, Incorporated,[1] David Pylipow and Hallmark Marketing Corporation Voluntary Severance Pay Plan ("Voluntary Plan").[2] This case grows out of a dispute between Pierson and Hallmark over Pierson's alleged right to participate in an enhanced severance package offered shortly after Pierson retired from Hallmark.

In late December 1994 or early January 1995, plaintiff contacted Hallmark Regional Human Resources Manager Eric Herman to explore taking early retirement. On or about January 18, 1995, plaintiff met with Herman to discuss the possibility of retirement. At the meeting, plaintiff allegedly asked Herman whether he should delay his retirement date in order to take advantage of any planned changes to the retirement program. Plaintiff was allegedly told that there was no such plan being contemplated or that there was no such plan of which the supervisory personnel or human resources personnel were aware. Plaintiff was allegedly advised that there were no retirement packages available for field sales employees and that he would be "better off" retiring now rather than waiting for such a retirement program.

At the meeting, plaintiff was offered a Severance Agreement, which included not only substantial benefits but also a lump sum payment of $61,312.50 (less appropriate payroll deductions) and an additional lump sum payment of $6,658.00 (less appropriate payroll deductions) for health insurance. Plaintiff executed that Severance Agreement and then chose a date for his retirement at the end of January 1995. At the request of his supervisor Roy Hass, plaintiff agreed to postpone his last day of employment to February 17, 1995, in order to complete the 1994 performance reviews for the employees who reported to plaintiff.

On February 17, 1995, plaintiff retired from Hallmark. In addition to his Severance Agreement, plaintiff was entitled to receive and is receiving certain benefits through Hallmark Career Rewards Benefit Plans ("Career Rewards"). As part of Career Awards, plaintiff received or is receiving the following benefits: (1) a $675,487.00 lump sum profit sharing payment fully funded by Hallmark, (2) $864.20 per month for life, and if plaintiff predeceases his wife, $864.20 to plaintiff's wife for the remainder of her life,

---

1. Defendant Hallmark Marketing is a wholly-owned subsidiary of Hallmark Cards, Incorporated. The two companies are collectively referred to herein as "Hallmark."

2. The Voluntary Plan is an employee pension plan governed by Employee Retirement Income Security Act ("ERISA").

all of which is fully funded by Hallmark, (3) a $30,657 .00 life insurance policy fully funded by Hallmark, and (4) medical, dental and vision coverage for life for plaintiff and his wife for $150.75 per person per month. Although plaintiff received or is receiving benefits under the Severance Agreement and Career Awards plan, plaintiff claims that he should be entitled to receive greater benefits under a voluntary severance plan that was developed and offered to eligible employees after he retired from Hallmark.

### B. Development and Implementation of a Severance Plan

In 1994, Hallmark undertook a broad-based initiative focused on identifying ways to increase revenues and improve corporate profitability while reducing costs. This study became known as the Organizational Effectiveness Study ("OES"). Through the study, Hallmark wanted to make sure that the corporate structure was appropriate and that the proper resources were being devoted to profitability and the development of a more effective organization aimed at achieving the company's strategies.

Throughout the fall of 1994, the Operating Committee charged with the responsibility for OES devoted its efforts to determining optimal strategies for enhancing profitability and reducing costs. By the late fall or early winter of 1994, the Operating Committee had begun to undertake a review of recommendations made by teams charged with different aspects of OES, ultimately agreeing on the overall parameters of an organizational restructure as one of the components of the OES process.

On January 11, 1995, Hallmark's chief executive officer Irvine O. Hockaday announced the restructuring of senior management at Hallmark as a preliminary step in implementing the OES recommendations. As the next step in the process, senior management then developed the structure for mid-level management in early spring of 1995. In the field sales area in which plaintiff worked prior to his retirement, management was faced with restructuring its sales force in the spring of 1995.

As Director of Employee Relations, David Pylipow was directly involved in the implementation of the work force restructuring in field sales and the reduction in work force. Faced with this task of eliminating employment positions, Pylipow gave serious thought to the complex issues involved while on vacation the week of March 20, 1995. During that week, Pylipow first gave consideration to the idea of offering an early retirement incentive as part of the restructuring of the field sales work force. This fact is uncontradicted.

Upon returning from vacation, Pylipow discussed the possibility of an early retirement incentive with Michael Johnson, Human Resources Director—Retail Development, and Jerry Kenefake, Director of Compensation and Benefits. On March 31, 1995, Pylipow discussed his idea for an early retirement incentive package at a meeting attended by Kenefake, Theresa Hupp, Assistant General Counsel, and James Overman. Following the meeting, a preliminary draft of the Voluntary Plan was prepared. In early April 1995, the possible early retirement incentive was discussed with Hallmark sales managers who would be impacted by the loss of senior employees who might opt for the early retirement incentive package.

Before the Voluntary Plan could be implemented, it had to be approved by Hallmark's North American Management Team ("NAMT"). On April 7, 1995, Pylipow made a presentation about the Voluntary Plan to the NAMT. The April 7 meeting was the first time that the NAMT gave consideration to the Voluntary Plan. At this meeting, the NAMT gave Pylipow its approval for the completion and implementation of the Voluntary Plan. On April 17, 1995, the Voluntary Plan became effective.

On April 25, 1995, Kenefake issued a letter about the Voluntary Plan to eligible employees, enclosing a copy of the Summary Plan Description and inviting them to make a decision no later than June 15, 1995, about participation in the Plan. Ultimately, 87 out of the 142 eligible employees elected to participate in the Voluntary Plan.

In addition to this Voluntary Plan, some evidence has been produced which indicates that as part of the OES process, Pylipow was asked to "explore" the possible use of involuntary severance plans. In the fall of 1994, Pylipow was requested by his "manager" to "get[ ] familiar with methods of downsizing a work force...." (Pylipow Dep. at 34). In response to this request, Pylipow began to explore involuntary severance options which could be utilized in various areas of the company. Pylipow also discussed these involuntary severance options with in-house counsel. Pylipow, at the time he was researching possible involuntary severance plans, was unaware of the magnitude of any possible layoffs in the field sales force, first learning that information several weeks prior to his March 1995 vacation.

On February 3, 1995, Pylipow did present a severance proposal to the NAMT. The severance proposal was a comparison of involuntary severance packages at other companies with a proposal that Hallmark could utilize as soon as the divisions, including field sales, had completed their strategies for addressing work force reductions. The chart attached to the NAMT minutes of February 3, 1995 reflect that severance was only being considered at that point on an involuntary basis. There was no discussion at that meeting about a voluntary severance package. At this meeting, NAMT voted not to implement any involuntary plan because Hallmark was not certain that there would be a significant number of employee layoffs, and any consideration of an involuntary severance package was thus premature.

Ultimately, Hallmark did adopt an involuntary severance plan, entitled the Hallmark Marketing Corporation Field Sales Employee Severance Pay Plan ("Involuntary Plan"), after the adoption of the Voluntary Plan. Hupp distributed the first draft of the Involuntary Plan on April 3, 1995, along with the initial draft of the Voluntary Plan.

---

3. A review of the evidence indicates that Pierson never asked to participate in the involuntary severance plan. Indeed, plaintiff's claim centers around his contention that if he knew of the Voluntary Plan, he would have elected to remain at Hallmark until the Voluntary Plan was offered to eligible employees.

## C. Plaintiff's Claim to Entitlement under the Voluntary Plan .

In late April 1995, plaintiff became aware of the Voluntary Plan and wrote to Hallmark requesting that he be included in the Voluntary Plan.[3] By letter dated May 9, 1995, plaintiff was advised by Pylipow that he was not eligible for the Voluntary Plan. Pylipow enclosed a copy of the Summary Plan Description with his May 9 letter, and invited plaintiff to submit a letter explaining his claim pursuant to the Voluntary Plan's claims procedure. Plaintiff admits that he received Pylipow's May 9 letter and the Summary Plan Description.

On May 16, 1995, plaintiff wrote Pylipow a letter, setting forth his claim to benefits under the Voluntary Plan. In essence, plaintiff argued that as a life-long employee he should be entitled to participate in the Voluntary Plan due to the fact that Hallmark was considering the Voluntary Plan at the time he was still employed by Hallmark, especially in light of the fact that he had asked Herman whether Hallmark was considering any severance packages.[4] On June 5, 1995, Pylipow, acting as Plan Administrator, wrote plaintiff a letter in which he rejected plaintiff's claim to benefits under the Voluntary Plan. In his letter, Pylipow explained plaintiff's appeal rights under the Voluntary Plan. Plaintiff admits that he received this letter. Plaintiff did not appeal his claim to the Claims Board.

By letter dated February 16, 1996, counsel for plaintiff requested of Donald Hall and Pylipow that the prior decision be reconsidered. By letter dated March 14, 1996, plaintiff's counsel was advised by Hupp that plaintiff's renewed request was denied. In response, plaintiff filed suit against defendants in the Pennsylvania state courts, the law suit was subsequently removed to this Court.

---

4. In his response to defendants' motion, plaintiff also notes that two other former employees of Hallmark who retired prior to April 1, 1995 were given the benefits of the Voluntary Plan despite the fact that they did not meet the eligibility requirements.

In his Complaint, plaintiff asserts that the Voluntary Plan was under serious consideration prior to his retirement and/or prior to January 18, 1995, and that he was never advised of the pending Voluntary Plan. Plaintiff alleges he was improperly denied the right to participate in the Voluntary Plan and that defendants intentionally concealed information from him regarding the Voluntary Plan. As a result, plaintiff contends that he is entitled to benefits under the Voluntary Plan as well as damages and other relief for the following claims asserted under ERISA and state law: (1) Count I—discriminatory conduct under ERISA § 510, 29 U.S.C. § 1140; (2) Count II—breach of fiduciary duty under ERISA, 29 U.S.C. §§ 1104, 1109, 1132(a)(2); (3) Count III—recovery of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B); (4) Count IV—failure to provide information under ERISA, 29 U.S.C. §§ 1024(b), 1132(c); (5) Count V—state law fraud; and (6) Count VI—state law "other misrepresentation." [5]

Defendants now move for summary judgment on Counts I–III and V–VI of plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 56. In response, plaintiff argues that genuine issues of material facts exist as to each and every Count of his complaint; and as such, summary judgment is inappropriate. The Court will consider the parties' arguments *seriatim.*

## II. Legal Standard

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir.1988). "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence presented must be viewed in the light most favorable to the nonmoving party. *Id.* 477 U.S. at 259.

The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988). The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial. *Id.* 477 U.S. at 324. Moreover, when the non-moving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir.1987) (quoting *Celotex*, 477 U.S. at 322).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White*, 862 F.2d at 59 (quoting *Celotex*, 477 U.S. at 322). The non-movant must specifically identify evidence of record, as opposed to general averments, which supports his claim and upon which a reasonable jury could base a verdict in his favor. *Celotex*, 477 U.S. at 322. The non-movant cannot avoid summary judgment by substituting "conclusory allegations of the complaint ... with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Rather, the motion must be denied only when "facts specifically averred by [the non-movant] contradict facts specifically averred by the movant." *Id.*

---

**5.** By Order date May 6, 1997, this Court granted in part and denied in part defendants' motion to dismiss. The Court granted defendants' motion to dismiss Count IV of plaintiff's Complaint and plaintiff's prayer for punitive damages, delay damages and other extracontractual relief under plaintiff's ERISA claims. The motion to dismiss was denied in all other respects.

## III. Discussion

Holding the evidence in a light most favorable to plaintiff, the Court grants summary judgment in favor of defendants. There simply exist no genuine issues of material fact that would warrant sending this case to a jury. As a matter of law, defendants are entitled to judgment in their favor on Counts I–III and Counts V–VI. The Court's reasoning follows.

In Count II of his Complaint, plaintiff seeks recovery from the defendants based on the contention that Hallmark, as Plan Administrator under ERISA, breached its fiduciary duties under ERISA by failing to administer the Voluntary Plan solely in the interest of all participants, including himself.[6] In his Complaint, plaintiff contends that the defendants breached fiduciary duties to him through misrepresentations and omissions of material fact with respect to the Voluntary Plan based on plaintiff's allegations "that the [Voluntary] Plan was under serious consideration prior to [his] retirement and/or prior to January 18, 1995, however, [he] was never advised of the pending Plan." Defendants argue that they did not breach any fiduciary duties to plaintiff.

■ The Third Circuit has instructed that " '[a] plan administrator may not make affirmative material misrepresentations to plan participants about changes to an employee pension benefits plan. Put Simply, when a plan administrator speaks, it must be truthfully.' " *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533, 1538 (3d Cir.1996) (*"Fischer II"*) (quoting *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir.1993) (*"Fischer I"*)). This rule of truthfulness is grounded in the "materiality of a plan administrator's misrepresentations." *Id.* This materiality standard is a mixed question of law and fact, focussing on whether " 'there is substantial likelihood that [the misrepresentation] would mislead a reasonable employee in making an adequately informed decision about if and when to retire.' " *Id.* (quoting *Fischer I*, 994 F.2d at 135). Within the materiality inquiry there " 'will be an inquiry into the seriousness with which a particular

change to an employee pension plan is being considered at the time the misrepresentation is made.' " *Id.*

■ Thus, to maintain a claim for breach of fiduciary duty based on material misrepresentations or omissions regarding a proposed ERISA plan, the plan must have been under "serious consideration" at the time the misrepresentation was made. The Third Circuit has explained:

> in any case where the misrepresentation in question is the statement that no change in benefits is under consideration, the only factor at issue is the degree of seriousness with which the change was in fact being considered.

*Id.* Under this scenario, the crux of the inquiry is serious consideration.

■ Serious consideration of a possible change to plan benefits is found to exist "when (1) a specific proposal (2) is being considered for purposes of implementation (3) by senior management with the authority to implement the change." *Id.* at 1539. To provide guidance to the district courts whom are charged with applying this "amorphous" standard of serious consideration, the Third Circuit in *Fischer II* expounded on the requirements of serious consideration in some detail.

With respect to the requirement that there exist a specific proposal, the Third Circuit stated that:

> [a] specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal. What is required, consistent with the overall test, is a specific proposal that is sufficiently concrete to support consideration by senior management for the purpose of implementation.

*Id.* at 1540.

The *Fischer II* court continued by defining the second element in great detail:

> [t]he second element, discussion for implementation, further distinguishes serious consideration from the preliminary steps of gathering data and formulating strategy. It also protects the ability of senior man-

---

**6.** Plaintiff claims that defendants breached their fiduciary duties under 29 U.S.C. §§ 1104, 1109.

agement to take a role in the early phases of the process without automatically triggering a duty of disclosure. This factor recognizes that a corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits. Preliminary stages may also require interaction among upper level management, company personnel, and outside consultants. These discussions are properly assigned to the preliminary stages of company deliberations. Consideration becomes serious when the subject turns to the practicalities of implementation.

*Id.*

With respect to the third element, the Third Circuit stated that:

[t]he final element, consideration by senior management with the authority to implement the change, ensures that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy.... Until senior management addresses the issue, the company has not yet seriously considered a change. Consideration by senior management is also limited to those executives who possess the authority to implement the proposed change.

*Id.*

█ Applying this detailed definition of serious consideration to the facts of this case, the Court finds that plaintiff has failed to demonstrate that either the Voluntary Plan or any involuntary plans were under serious consideration at the time of plaintiff's meeting with Herman or when he retired on February 17, 1995. Plaintiff has not produced even a scintilla of evidence that the Voluntary Plan was under serious consideration at any time during which plaintiff was employed by Hallmark. Admittedly, Pylipow did not develop the idea of the Voluntary Plan until he was on vacation the week of March 20, 1995. In addition, the first draft of the plan was not distributed until April 3, 1995 and not approved by the NAMT until April 7, 1995. There simply exists no basis in the record upon which plaintiff can assert that the Voluntary Plan was seriously considered while he was employed by Hallmark.

Having been unable to establish that the Voluntary Plan was being seriously considered by Hallmark at the time of his employment, plaintiff claims that Hallmark was seriously considering involuntary severance plans while he was still employed by Hallmark and after he had inquired into the existence of severance plans. As such, plaintiff claims that he is entitled to participate in the Voluntary Plan due to defendants' breach of fiduciary duties through misrepresentations and omissions with respect to the involuntary plans. Putting aside the issue as to whether plaintiff can rightfully base his claim to participate in the Voluntary Plan due to misrepresentations with respect to involuntary severance plans, the Court finds that defendants never seriously considered involuntary severance plans during plaintiff's employment.

The evidence, held in a light most favorable to plaintiff, establishes that a specific proposal was never discussed for the purposes of implementation by senior management. Plaintiff can merely show that Pylipow conducted a preliminary investigation into alternative involuntary severance packages and then presented this comparative study to the NAMT at a meeting held on February 3, 1995. At this meeting, the NAMT rejected that adoption of any involuntary severance plan because it was unsure as to the magnitude of employee layoffs, and thus the adoption of any involuntary plan was considered premature.

This conduct by defendants is exactly the type of conduct that the *Fischer II* court stated should not be considered serious consideration. The "discussion for implementation" requirement "protects that ability of senior management to take a role in the early phases of the process without automatically triggering a duty of disclosure." *Fischer II*, 96 F.3d at 1540. This requirement permits a "corporate executive [to] order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits." *Id.* This "[c]onsideration becomes serious when the subject turns to the practicalities of implementation." In this case, the consideration of the involuntary severance

plans never reached the stage at which senior management was considering the "practicalities of implementation" of an involuntary severance plan. Admittedly, the NAMT voted not to adopt or implement any of the involuntary severance plans proposed by Pylipow. Plaintiff thus can not argue that serious consideration was given to the involuntary plans. Thus, Count II of plaintiff's Complaint must fail.

In Count I of his Complaint, plaintiff seeks recovery from all defendants based on the contention that the defendants allegedly made misrepresentations and/or omissions with respect to the Voluntary Plan, thereby interfering with plaintiff's attainment of the right to participate in the Voluntary Plan in violation of ERISA § 510, 29 U.S.C. § 1140. Because the facts demonstrate that defendants did not engage in "discriminatory conduct" within the meaning of Section 510, summary judgment should be entered in favor of defendants and against plaintiff on Count I of plaintiff's Complaint.

■ Section 510 provides, in relevant part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participants may become entitled under the plan....

29 U.S.C. § 1140. "To recover under this provision, an employee must show '(1) prohibited conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.'" *Fischer II*, 96 F.3d at 1543 (quoting *Gavalik v. Continental Can Co.*, 812 F.2d 834, 852 (3d Cir.1987)).

In this case, plaintiff attempts to state a claim for "discriminatory conduct" under 29 U.S.C. § 1140 by alleging that the defendants "induc[ed] plaintiff to retire and/or induct[ed] him not to defer his retirement before the Plan was announced." Plaintiff contends that when he raised the issue of possible retirement in January 1995, "[h]e was advised that there were no retirement packages available for employees and he would be better off retiring now than waiting for such a retirement program." Plaintiff's claim is thus based on allegations of discrimination with respect to a new plan with severance benefits.

■ Plaintiff's Section 510 claim must fail. Under the law of this Circuit, "suits for discrimination under § 510 are 'limited to actions affecting the employer-employee relationship,' not mere changes in the level of benefits." *Fischer II*, 96 F.3d at 1543 (quoting *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan*, 24 F.3d 1491, 1503 (3d Cir.1994)). In *Fischer II*, the Court concluded that the early retirement package extended by the defendant company only changed the benefit level of its pension plan; the plan did not alter the employer's relationship with its retirees. Therefore, the plaintiffs in *Fischer II* could not state a claim for recovery under ERISA § 510.

In *Haberern*, the Third Circuit recognized that "Congress enacted Section 510 primarily to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension benefits.'" *Haberern*, 24 F.3d at 1502–03 (quoting *Gavalik*, 812 F.2d at 851). The United States Court of Appeals for the Seventh Circuit similarly found that "'a fundamental prerequisite to a § 510 action is an allegation that the employer-employee relationship, *and not merely the pension*, was changed in some discriminatory or wrongful way.'" *McGath v. Auto–Body North Shore, Inc.*, 7 F.3d 665, 668 (7th Cir.1993) (quoting *Deeming v. American Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir.1990)) (emphasis added).

Plaintiff's allegations, even if held to be true, do not demonstrate that defendants "harassed" or "discharged" plaintiff to keep him from obtaining vested benefits. Instead, they merely amount to a claim that defendants' allegedly discriminatory conduct led to an adverse change in the level of his pension benefits. Section 510 liability cannot be properly imposed on defendants under these facts.

■ Moreover, defendants' gratuitous payment of benefits under the Voluntary Plan to other employees who retired near the time of plaintiff's retirement does not create a cause of action for plaintiff under ERISA § 510. At the core of plaintiff's Section 510 claim is his complaint that two other Hallmark field sales employees, who also retired prior to the effective date for the Voluntary Plan, received benefits under the Voluntary Plan while he did not.

Even if plaintiff were able to demonstrate such disparate treatment, Section 510 does not provide plaintiff with relief. *See, e.g., McGath,* 7 F.3d at 670; *Haberern,* 24 F.3d at 1503–04; *Jefferson v. Vickers,* 102 F.3d 960, 964–65 (8th Cir.1996). To set forth a claim under Section 510, a plaintiff has to demonstrate that he may be entitled to receive benefits under the plan in question. 29 U.S.C. § 1140. "ERISA § 510 affords protection from discrimination that interferes 'with the attainment of any right to which such participant may become entitled under the plan.'" *McGath,* 7 F.3d at 670 (quoting 29 U.S.C. § 1140). Applying Section 510 to a disparate treatment claim, the *McGath* court found that: "Mr. McGath does not have a right to treatment that is contrary to the terms of the plan, even if those terms are breached for others."

In this case, plaintiff cannot even present a prima facie case of discrimination in light of the non-existence and non-consideration of the Voluntary Plan for the field sales force at the time of his retirement. However, even if plaintiff could prove the existence and consideration of the Voluntary Plan prior to his retirement, his allegations that other early retirees were able to participate in and receive the benefits under the Voluntary Plan is irrelevant to his Section 510 claim because he cannot prove that he ever satisfied the Voluntary Plan's requirements in order to be entitled to participate in the plan. Thus, the

Court grants summary judgment in favor of defendants and against plaintiff on Count I of plaintiff's Complaint.[7]

In Count III of plaintiff's Complaint, plaintiff seeks benefits under the Voluntary Plan pursuant to ERISA § 502, 29 U.S.C. § 1132(a)(1)(B). Section 502 provides that:

A civil action may be brought—

(1) by a participant or beneficiary—

(B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. 1132(a)(1)(B).[8] Plaintiff claims that he would have been eligible for the Voluntary Plan if he had not relied on the misrepresentations of defendants. If plaintiff was aware of the possibility of the Voluntary Plan, he would have delayed retirement in order to take advantage of it. Thus, he claims benefits pursuant to Section 502.

■ "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). Because Section 6.1 of the Voluntary Plan expressly gives the Plan Administrator discretionary authority to determine eligibility for benefits under the Voluntary Plan, plaintiff's claim is subject to an arbitrary and capricious standard of review. "Under the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn a decision of a Plan Administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993) (quoting *Adamo v. Anchor*

---

7. Plaintiff has also failed to produce any evidence that defendants "purposefully interfered" with plaintiff's rights under the Voluntary Plan. Since the Voluntary Plan had not even been conceived at the time of plaintiff's retirement, defendants could not have "purposefully interfered" with plaintiff's rights under this plan.

8. 29 U.S.C. § 1002(7) defines the term "participant" as:

any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer....

29 U.S.C. § 1002(7).

*Hocking Corp.*, 720 F.Supp. 491, 500 (W.D.Pa.1989)).

■ Applying this standard of review, the Court finds that there is substantial evidence in the record to support the Plan Administrator's denial of benefits to plaintiff under the Voluntary Plan because the plaintiff did not meet the "active employment" criteria for eligibility set forth in the Voluntary Plan. The effective date of the Voluntary Plan was April 17, 1995. Persons considered to be employees on the effective date were defined as: "persons ... actively employed in any full-time field sales or regional sales office position by the Employer." Under the express terms of the Voluntary Plan, plaintiff was not eligible for benefits because he was not actively employed by Hallmark in a full-time field sales or regional office position at the time the Voluntary Plan was offered. Plaintiff retired on February 17, 1995, prior to the effective date of the Voluntary Plan and even prior to the date the Voluntary Plan was first considered for the field sales force. Because plaintiff was not eligible for benefits under the Voluntary Plan, summary judgment is entered in favor of defendants and against plaintiff on Count III of plaintiff's Complaint.

■ Defendants also move for summary judgment on Counts V and VI of plaintiff's Complaint on the grounds that plaintiff's state law claims based on fraud and misrepresentation are preempted by ERISA § 514, 29 U.S.C. § 1144(a). Section 514 provides, in relevant part:

> Except as provided in subsection (b) of this section [the savings clause],[9] the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . .

To demonstrate that a state law claim is preempted, a defendant must prove that the employee benefit plan is an ERISA plan and that plaintiff's state law claims "relate to" an ERISA plan.

Applying this test, the Court finds that plaintiff's state law claims are preempted by ERISA. First, there is no question that the Voluntary Plan is an ERISA plan.[10] Second, the evidence in this case clearly demonstrates that plaintiff's fraud and "other misrepresentation" claims in Counts V and VI of his Complaint "relate to" the Voluntary Plan. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983) ("A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."). In Count V of his Complaint, plaintiff alleges that the defendants made fraudulent misrepresentations to him regarding the possible availability of an enhanced severance package. In Count VI, plaintiff asserts similar allegations about misrepresentations of material fact made by defendants, seeking recovery under the principles of the Restatement (Second) of Torts § 552C. Because these claims "relate to" the Voluntary Plan, the Court finds that Counts V and VI are preempted by ERISA § 514(a). Therefore, the Court grants summary judgment in favor of defendants and against plaintiff on Counts V and VI of plaintiff's Complaint.

## IV. Conclusion

Accordingly, for the foregoing reasons, the Court grants defendants' motion for summary judgment. It is further ordered that judgment is entered in favor of defendants and against plaintiff on all Counts of plaintiff's Complaint.

An appropriate Order follows.

---

**9.** The "savings" provision set forth in § 514(b), which protects claims based on "state regulations unrelated to the substantive provisions of ERISA" from preemption, does not apply in this case because plaintiff's claim arose out of defendants' alleged fraudulent misrepresentations/omissions regarding benefits under the Voluntary Plan, allegations which go to the heart of ERISA's substantive provisions.

**10.** Section 6.7 of the Voluntary Plan states that: "The Employer intends for this Plan to constitute a 'welfare plan' under the Employee Retirement Income Security Act of 1974, as amended, and any ambiguities in this Plan shall be construed to effect that intent."

## *ORDER*

AND NOW, this 23rd day of June, 1997, upon consideration of defendants' Motion for Summary Judgment, and plaintiff's response thereto, and defendants' reply thereto, it is hereby ORDERED that said Motion is GRANTED. IT IS FURTHER ORDERED that JUDGMENT is ENTERED in favor of defendants and against plaintiff on all counts of plaintiff's Complaint.

AND IT IS SO ORDERED.