**Ronald DAVIDSON, Plaintiff,**

**v.**

**Nurse BARTHOLOME; G. Ewald; Sgt. Augustine; Nurse Linda Rolling; and Ann E. Kowol, Defendants.**

**No. 92 CIV. 1864 CM.**

United States District Court,
S.D. New York.

Oct. 12, 2006.

Ronald Davidson, Alden, NY, pro se.

Carol Schechter, New York State Department of Law, New York, NY, for Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

### Introduction

*Pro se* plaintiff Ronald Davidson alleges that he denied needed pain medication by various Department of Correctional Services (DOCS) personnel in retaliation for two lawsuits he had previously brought against DOCS staff members. Davidson filed this *pro se* action pursuant to 42 U.S.C. § 1983, alleging violations of his alleged rights under the United States Constitution. This suit is one of the more than 150 lawsuits that Davidson has brought against DOCS and against DOCS employees during his 30 years of incarceration for triple homicide.

The defendants, Nurse Elaine Booth (sued incorrectly as "Nurse Bartholome") Nurse Linda Rohling (incorrectly sued as "Rolling"), and Ann E. Driscoll (formerly known as and sued as Kowol) filed a motion for summary judgment dismissing Plaintiff's claim. Because plaintiff fails to support any claim for relief as a matter of law (even viewing his version of the facts to be true), defendants' motion is granted. The Court *sua sponte* dismisses plaintiff's claims against the Estate of Sergeant Augustine, which has not been served with process.

### Facts

Most of the key facts in the complaint are disputed. Plaintiff is presently incarcerated at Shawangunk Correctional Facility, serving three consecutive 25–year to life sentences for his 1976 convictions, on three counts of murder in the second degree. Plaintiff states that he has had back problems all during his incarceration, but that it really got bad in 1987, while at Auburn Correctional Facility, prompting the medical staff there to provide him with

Motrine. Harben Decl., Ex. D (Plaintiff's Deposition) 23: 16–23. At some point, either at Auburn or a subsequent facility, plaintiff was started on a regimen of Naprosyn. *Id.* Naprosyn is an over-the-counter medication used for treating mild to moderate pain. Declaration of Dennis E. Wolf, M.D., ("Wolf Decl."), Ex. A.

In 1988, Plaintiff had surgery on his lower back at Glens Falls Hospital, in Glens Falls, New York. *Id.* 26: 1–9. Plaintiff continued taking Naprosyn after this procedure until he developed an ulcer in the mid–1990s. *Id.* 28: 21–25; 30:22–25, 31: 1. Plaintiff would take Naprosyn from two to four times a day. Since it was a "self-med," (i.e., self-administered medication), plaintiff was given a two or four week supply of the medication and was allowed to take it when needed. *Id.* 36: 18–25, 37: 1–10. Around the time of this incident, he was also taking Vancenase (a seasonal allergy inhaler) and Refresh eye drops. *Id.* 15–24.

In October 1991, plaintiff was scheduled to be transferred from Clinton Correctional Facility ("Clinton") to Attica Correctional Facility ("Attica"), making stops at Downstate Correctional Facility ("Downstate") and Auburn Correctional Facility ("Auburn") on the way. Plaintiff's belongings at Clinton were packed up on October 1, 1991. Plaintiff is unsure if he took his last dost of Naprosyn the morning he was transferred or the night before. *Id.* 42: 19–35, 43: 1–10.

Plaintiff was transferred from Clinton to Downstate by bus on October 2, 1991, and estimated the trip took approximately six to eight hours. *Id.* 39: 2–18. It is unclear whether plaintiff arrived at Downstate at around 7:00 p.m. *Id.* 40: 13–25, 41: 1–17.

Plaintiff alleges he asked the guards for Naprosyn as soon as he arrived at Downstate, and saw Nurse Booth within an hour of his arrival. *Id.* 48: 22–25, 49: 1–3. Plaintiff claims he asked Nurse Booth for Naprosyn, Vancenase, and eye drops, all of which she had in her possession, but that Booth she would not give him the medications, saying she ". . . .wanted to teach me a lesson, and she felt that if I suffered pain every time I came through Downstate, that I would be less likely to file lawsuits." *Id.* 51: 1–25, 52: 1–22.

Nurse Booth's story is entirely different. She claims that on the evening he arrived, the plaintiff complained of chest pain, and after examining him, she concluded that the plaintiff was not experiencing any cardiac distress. Harben Decl., Booth Declaration ¶¶ 3–4. She said she had not found the plaintiff's medical records when she examined him, because they had been inadvertently left behind at the draft processing center. When she did receive them, she gave plaintiff his medications. *Id.* ¶¶ 6–7. Nurse Booth also denies Plaintiff's allegations that she was hostile toward him or made disparaging remarks to him. *Id.* ¶ 9.

After his meeting with Nurse Booth, plaintiff was brought to a housing unit. He asked Defendant G. Ewald, a Corrections Officer to give him his medication and to call the Watch Commander and the area Sergeant. *Id.* 53: 8–25. Plaintiff testified that Ewald said he knew of a recent "Smith" trial (Smith was a Downstate employee against whom plaintiff had brought a prior unrelated lawsuit), and his other lawsuits at Green Haven (Cplt at 15), and the only way Davidson would get to see a Watch Commander or Sergeant is if he fell unconscious—needing pain medication was not sufficient. *Id.* 54: 4–7.

Ewald does not recall plaintiff complaining of medical problems on October 2, 1991, and does not recall being provided with medication to dispense to the plaintiff. Harben Decl., Ewald Declaration ¶¶ 2–4. Ewald also testified that it was not within his power to compel the Sergeant or Watch Commander to meet with an inmate

just because the inmate asked to see the Sergeant. *Id.* ¶ 2.

Ultimately, however, Ewald's intervention proved unnecessary, because plaintiff was able to speak to Sergeant Augustine about an hour after he was brought to the housing unit. Plaintiff testified that Augustine was very hostile and referred to the Smith trial *Id.* 56: 15–25, 57: 1–2. Despite these repeated expressions of hostility from the staff, however, plaintiff received a dose of Naprosyn, Vancenase, and Refresh eye drops from a Lieutenant Glass that very evening. *Id.* 58: 14–25, 59: 1–17.

On the morning of October 3, 1991, plaintiff again asked for his medications, and saw Nurse Rohling. *Id.* 60: 11–16. Plaintiff alleges that Nurse Rohling would not give him his medication for "the same basic reasons Nurse Bartholme [Booth] had." Davidson Deposition 61: 1–11.

Nurse Rohling testified that the plaintiff complained only of chest tightness, and that the plaintiff requested no medication from her. Harben Decl., Rohling Declaration ¶¶ 3–5. She concluded the plaintiff was not experiencing a cardiac problem. Rohling denies knowing anything about the plaintiff before she treated him. *Id.* ¶¶ 5–7.

Within fifteen to thirty minutes of his meeting with Nurse Rohling, plaintiff was placed on a bus to continue on to Auburn, a five to seven hour trip. *Id.* 12–23. Plaintiff asked for his medication as soon as he arrived at Auburn, and saw Nurse Driscoll (Kowol), who he alleges failed to give him his medications, saying, "You want these? Fat chance. The last time you were here you sued half of the medical staff.... Marsha Hares [presumably a DOCS employee sued by plaintiff] is a friend of mine. Remember that." Davidson Deposition at 64:18 –65:5

Nurse Driscoll alleges that she examined the plaintiff in response to an emergency sick call that plaintiff was having a heart attack, and found that the plaintiff showed no signs of cardiac distress upon examination. Declaration of Ann Driscoll ¶ 4. At one point, he admitted he was not actually having a heart attack. *Id.* ¶ 3. Plaintiff also requested Naprosyn, which Nurse Driscoll did not have in her possession. She was unaware that plaintiff had been prescribed this medication. *Id.* ¶ 5. She denies taunting or making any statements concerning litigation to the plaintiff. *Id.* ¶ 6.

On October 4, 1991, plaintiff was transferred from Auburn to Attica. When he arrived at Attica, he asked for his medications. The staff at Attica allegedly withheld his medications from him from October 4 to October 7, 1991. That claim—which would be improperly venued in this district-is the subject of a separate lawsuit that plaintiff has filed in the Western District of New York. *Id.* 66: 12–17.

*Procedural History*

Plaintiff filed his complaint on March 16, 1992. The matter was assigned to The Hon. Louis J. Freeh. On June 26, 1992, Judge Freeh referred the case to Magistrate Judge Kathleen Roberts.

Plaintiff originally brought a claim for injunctive relief regarding the future dispensation of his medication. On February 23, 1993, Judge Roberts recommended that plaintiff's application for injunctive relief be denied without prejudice. She advised plaintiff to pursue any claim concerning ongoing deprivation of medication in the Western District of New York, where Attica is located. In March, 1993 Judge Freeh accepted and adopted the Magistrate's report.

Defendants moved for summary judgment in March of 1993, prior to discovery.[1]

---

**1.** Indeed, plaintiff was only recently deposed by the defendants, and the declarations of

On April 7, 1993, Magistrate Judge Roberts recommended that the defendant's motion for summary judgment be denied on the ground that disputed issues of fact precluded the entry of judgment as a matter of law. According to the docket sheet, Judge Freeh adopted the recommendation of Magistrate Judge Roberts on May 17, 1993.[2]

Between August, 1993, and October, 2004, the case was re-assigned six times. Throughout that period, it remained stayed pursuant to an order of Magistrate Judge Roberts, pending the completion of proceedings in an earlier case entitled *Davidson v. Scully*, 83 Civ.2025 (S.D.N.Y.). (Harben Aff. Ex. J at 3). The subject matter of *Scully* is identical to the subject matter of this case except for one key difference—its constitutional theory. In *Scully*, Davidson alleged that denial of proper medical care, specifically denial of Naprosyn, violated his Eighth Amendment rights. In August 1992, within five months of the filing of this lawsuit, The Hon. Mary Johnson Lowe of this court granted Davidson's motion for a preliminary injunction directing the Commissioner of DOCS to provide Davidson with, *inter alia*, proper distribution of Naprosyn. Harben Aff. Ex. J at 2. Eventually, Magistrate Judge Bernikow ruled in *Scully, inter alia*, that plaintiff's sporadic missing of Naprosyn during the few days while he was transferred from Clinton to Attica did not rise to the level of a violation of plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Harben Decl., Ex. H., 41. It is unclear whether the magistrate judge's recommendation was ever adopted by the district court.

The matter ultimately arrived on my desk. Because of the age of the case, it took considerable time for the newly-assigned Assistant Attorney General to locate the file in this matter and to investigate the case. Eventually he was able to review the records, and after conferencing the case by telephone last year, this court set a schedule for the briefing of a post-discovery motion for summary judgment by the Attorney General.

## Discussion

### Standard of Review

Under Federal Rule of Civil Procedure 56(c), a court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, " 'the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' When no such showing is made, '[t]he moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she had the burden of proof.' " *Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990) (citing *Celo-*

---

defendants' witnesses were provided for the first time in connection with the instant 2006 summary judgment motion.

**2.** Judge Freeh's decision adopting Magistrate Judge Roberts' recommendation—if there ever was such a decision—has apparently been lost from the court file and neither the plaintiff nor the defendants have produced a copy.

*tex,* 477 U.S. at 322–23, 106 S.Ct. at 2552) (internal citations omitted).

On a motion for summary judgment, the court views the record in the light most favorable to the non-moving party and resolves all ambiguities and draws all reasonable inferences against the moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs,* 834 F.2d 54, 57 (2d Cir.1987). I therefore view all the facts most favorably to the plaintiff and resolve all disputed issues of fact in his favor.

*The Impact of Judge Freeh's and Magistrate Roberts' Prior Decisions*

 When this court first raised the possibility of a motion for summary judgment, plaintiff protested that I "could not" allow defendants to make such a motion because Judge Freeh had adopted Magistrate Judge Roberts' decision denying such a motion, twelve (now thirteen) years earlier. Experienced litigant that he is, plaintiff referred to Judge Freeh's and Magistrate Roberts' decisions as "law of the case." Since I imagine this case will wend its way to the Court of Appeals, I address this argument.

 Unfortunately for plaintiff, there are aspects of the law of the case doctrine that he does not understand. The law of the case doctrine " 'ordinarily forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" *Field v. United States,* 381 F.3d 109, 114 (2d Cir. 2004) (quoting *United States v. Quintieri,* 306 F.3d 1217, 1229 (2d Cir.2002)). The doctrine also stands to limit a district court's discretion to reconsider its own decisions, in the absence of: an intervening change of law, the **availability of new evidence**, error that must be corrected, or if manifest injustice would otherwise ensue. *See Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers &*

*Lybrand, LLP,* 322 F.3d 147, 167 (2d Cir. 2003).

In the present case, defendants filed the initial summary judgment motion before any meaningful discovery was exchanged. Presented with an undeveloped record, Magistrate Judge Roberts ruled that there were disputed issues of fact and recommended that the motion be denied. According to the docket sheet, Judge Freeh adopted that recommendation on May 17, 1993.

 By contrast, the present summary judgment motion is supported by evidence gleaned from discovery exchanged and depositions taken after Judge Freeh decided the first motion. Nothing in the "law of the case" doctrine precludes this court from revisiting the denial of an earlier motion, when presented with new evidence. *Cf. Presser v. Key Food Stores Co-op., Inc.,* 2006 WL 2086346, *11 n. 2 (E.D.N.Y.,July 25, 2006). Indeed, it is well-settled that the law of the case doctrine does not prelude a court from entertaining a subsequent summary judgment motion on the basis of an amplified record. *See e.g., Lanci v. Arthur Anderson, LLP,* 2001 U.S. Dist. LEXIS 16883, at **1–2(S.D.N.Y. October 15, 2001).

So Magistrate Judge Roberts' opinion denying an earlier motion for summary judgment by defendants (which was adopted by Judge Freeh) does not preclude this court from considering the present motion.

Additionally, even if this court were bound by the learned Magistrate Judge's prior decision, that decision was to the effect that summary judgment was not appropriate because there were disputed issues of fact in this case. And indeed there are. The summary of the evidence set forth above makes that abundantly clear.

But not every disputed issue of fact precludes the entry of summary judgment or needs to be resolved by a jury. If, assuming the plaintiff's version of the disputed facts to be true, the defendants are nonetheless entitled to judgment as a matter of law, a court is free to grant their motion for summary judgment.

*Defendants are Entitled to Judgment as a Matter of Law*

Plaintiff contends that the various defendants withheld his medication to retaliate against him for his repeated institution of lawsuits against prison personnel.

■■ To establish a claim of retaliation, a plaintiff needs to show that his activity was protected by the First Amendment and that the conduct complained of was in response to this protected activity. *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 418 (2d Cir.1999). Several factors come into play in determining whether a causal connection exists: (1) the temporal proximity between the plaintiff's protected activity and the defendant's adverse action, (2) the prior disciplinary record of the inmate, (3) the outcomes of any hearings regarding the allegedly retaliatory charges, and (4) any statements defendant makes concerning his motive. *See Colon v. Coughlin,* 58 F.3d 865, 872–873 (2d Cir.1995).

■■ When considering the viability of an inmate's claim that corrections officials retaliated against him for engaging in constitutionally protected behavior, courts are correct to express a measure of "skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001). Indeed, the Second Circuit has instructed district courts to examine the retaliation claims of prisoners with particular care, since, "Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

The possibility of abuse, while ever present, is especially apparent in the instant case. Plaintiff has filed approximately 150 previous lawsuits.[3] Indeed, plaintiff is so litigious that he has been referred to by one court as a "serial litigator" who uses the court system as "a form of recreation" (Harben Decl., Ex. B at 5), and the United States Court of Appeals for the Second Circuit classifies plaintiff as a *pro se* litigant who is not entitled to have his pleadings and other papers liberally construed. *See Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994). *See also Davidson v. Dean,* 204 F.R.D. 251 (S.D.N.Y.2001). Former Judge John S. Martin of this court, when vacating Judge Lowe's original injunction, referred to plaintiff as a "virtual contempt motion machine." Harben Aff. Ex. L at 4. Claims of retaliation by such a prisoner are suspect without more.

■■ Furthermore, as noted above, Magistrate Judge Bernikow of this court has already ruled that plaintiff's contention that the alleged refusals to administer medication that are the subject of this retaliation action do not rise to the level of an Eighth Amendment violation. *See supra.,* at 7. While an adverse action need not rise to the level of a constitutional violation in order to qualify as retaliatory, (*see ACLU v. Wicomico County,* 999 F.2d 780, 785 (4th Cir.1993)("Retaliation by a public official for the exercise of a constitutional right is actionable ... even if the

---

**3.** Davidson quibbles with the State's numbers, suggesting that defendants are counting appeals and other collateral proceedings. Even accepting Davidson's statement that the State's calculation is "a bit high," it is safe to say that Davidson has filed scores of lawsuits naming DOCS employees who work at the various institutions where he has been incarcerated.

act, when taken for different reasons, would have been [constitutionally permissible]")), the fact that no Eighth Amendment claim would lie against any of these defendants for the conduct complained of adds to the skepticism surrounding plaintiff's allegations.

Of course, none of this would matter if plaintiff has complied with the rules applicable to motions for summary judgment and has managed to raise a genuine issue of material fact. However, he has not. Local Civil Rule 56.1 provides in relevant part that:

(b) The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

(c) All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

(d) Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

Plaintiff has failed to file a proper Rule 56.1 statement. Plaintiff merely includes a brief section in his affidavit in which he refutes, without citation to the record, statements in defendants' Rule 56.1 statement that: (1) plaintiff complained of "chest tightness," but did not complain of back and knee pain, and (2) that Correction Officer Ewald was not required to call "the area supervisor." Plaintiff's Aff. at 4–5. This experienced *pro se* plaintiff's failure to comply with the local rule provides a basis for this Court to accept defendants' statement of facts as true and to dismiss the complaint.

Having said that, the Court will nonetheless analyze the circumstances of each defendant separately and pass on the merit of the various claims. In so doing, I assume plaintiff's version of the facts to be true even though the various defendants dispute plaintiff's story.

 First is defendant G. Ewald. Plaintiff offers no evidence that Ewald did anything other than make a nasty remark to him concerning his litigious proclivities. Without evidence that an unnecessary statement by a prison guard contributed to some concrete threat to the prisoner's safety and welfare, the making of the statement does not rise to the level of First Amendment retaliation. *Dawes, supra.*, 239 F.3d at 493. As to this defendant, there is absolutely no evidence that he withheld any medication from plaintiff, or that his remark about Davidson's litigiousness led anyone else to do so. Indeed, there is no evidence that Ewald ever had any medication in his possession, or that he had the ability to procure plaintiff's medication for him. There is also no evidence that Ewald was able to compel a supervisor to meet with Davidson when plaintiff demanded such a meeting. Moreover, the undisputed evidence demonstrates that Sgt. Augustine (whether at Ewald's behest or not) met with Davidson within on hour of the prisoner's arrival on the housing unit.

Ewald appears to have been named as a defendant in this lawsuit simply because he had the misfortune to encounter Davidson during his overnight stay at Downstate. No evidence of retaliation has been adduced against him and the complaint is dismissed as to him.[4]

---

4. The record should clearly reflect that Ewald denied knowing anything about plaintiff's litigation history or saying anything to him that referred to that history. I assume plaintiff's testimony to be true for purposes of deciding this motion.

■ Next is Sergeant Augustine. The claims against him abated with his death. His Estate has neither appeared in this action nor moved for summary judgment (no doubt because there is no record on the court's docket that the Estate was ever served after being substituted in for the now deceased Sergeant).

Nevertheless, the court must dismiss the claim against Sgt. Augustine's Estate *sua sponte.* Plaintiff's testimony about the sergeant's role in this affair establishes beyond peradventure that no claim for retaliation lies against Augustine. Plaintiff testified that after explaining to Sergeant Augustine why plaintiff needed his medication, the sergeant became hostile and began cursing at him. Sergeant Augustine purportedly referred to an earlier lawsuit that plaintiff brought against a Downstate employee and told plaintiff that he was going to issue him a "false" misbehavior ticket. However, plaintiff states that Sergeant Augustine never followed through with any false report.

Plaintiff has no right to redress simply because the sergeant made a hostile or derogatory comment about him. It is undisputed that plaintiff received his medication from Lt. Glass on the very evening that Sgt. Augustine allegedly uttered the offending words. Plaintiff testified to this himself. So the sergeant did not cause plaintiff to suffer any adverse action, making dismissal of the retaliation claim mandatory.

This leaves the three nurses.

■ As to Nurse Kowal, the State argues that the claim should be dismissed as improperly venued, since she both lives and worked (on the relevant day) in the Northern District of New York.

That this claim should have been brought against Nurse Kowal in the Northern District is beyond cavil. However, improper venue is a defense that can be waived, and in this case it has been. Pursuant to Fed.R.Civ.P. 12(f), the defense of improper venue must be asserted in a pre-answer motion or in the answer to the complaint. No pre-answer motion was made in this case, and the answer filed on behalf of Nurse Kowal does not raise the issue of venue (it does raise belated service, but there is no evidence in the record to support dismissal on such ground). Regrettably, I must deny the Attorney General's tempting motion to dismiss the claim against Kowal on that ground.[5]

■ Plaintiff's claim against all three nurses is essentially the same. In his deposition testimony, plaintiff alleges not only that all three of them refused to provide him with Naprosyn, but also that each of them specifically told plaintiff that they were doing so because he had sued other DOCS personnel. The nurses deny making these remarks, which creates a genuine issue of fact concerning their allegedly retaliatory motive.

The question to be answered is whether the existence of that genuine issue of fact precludes summary judgment.

■ "While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes, supra.,* 239 F.3d at 492–93 (2d Cir.2001). Retaliation

---

**5.** It is not clear why the claim against Kowal was not transferred to the Northern District in early 1993. Magistrate Judge Roberts specifically ordered plaintiff to bring claims relating to his treatment while housed at Au-burn Correctional Facility in that district. Harben Aff. at Ex. J., at 4. It certainly should have been transferred at that time. There is nothing I can do about that now.

is actionable "...because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU v. Wicomico,* 999 F.2d 780, 785 (4th Cir.1993), cited in *Dawes, supra.,* 239 F.3d at 491. Alleged retaliation against a prisoner is actionable only if such retaliation is likely to chill a person of ordinary firmness from continuing to engage in constitutionally protected activity. *Dawes, supra.,* 239 F.3d at 493, citing *Thaddeus–X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999). Otherwise, the retaliatory act is deemed *de minimis* and outside the ambit of actionable First Amendment retaliation. *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir. 1999)(*per curiam* ).

Were the court applying a subjective rather than an objective test of firmness, Davidson could never prevail, because he was not in fact deterred by the nurses' refusal to treat him, either from filing the instant lawsuit (which he did a mere three weeks after these incidents) or from filing other suits, motions for contempt, and other matters. Indeed, the only fair reading of this record is that Davidson is "chill proof" in the same way that certain persons can be said to be "libel proof."

But of course the test is objective, not subjective, and must be so, since the very commencement of a lawsuit would otherwise be dispositive on the issue of chilling, *see Walker v. Pataro,* No. 99 Civ. 4607, 2002 WL 664040, at *9 (S.D.N.Y.Apr.23, 2002). However, application of an objective test does not negate the possibility that a prison official's retaliatory act will work only *de minimis* injury. As the Second Circuit concluded in *Dawes,* the inquiry concerning *de minimis* injury is fact-based.

So I must examine the record in order to determine whether plaintiff has made some non-*de minimis* showing of injury as a result of the actions of these three nurses. He has not.

As to Nurse Booth: assuming plaintiff's version of events to be true (as I must), her refusal to administer plaintiff a single dose of an over-the-counter pain reliever qualifies as *de minimis* in the circumstances of this case. Plaintiff arrived at Downstate at approximately 7 P.M. He was seen by Booth shortly after his arrival. He received his Naprosyn and his eye drops on the very same evening that Nurse Booth allegedly refused to treat him. Davidson offers no evidence to suggest that a person of ordinary firmness would be deterred from exercising his constitutional right to file grievances and lawsuits simply because he had to wait a few hours for access to his non-narcotic pain medication.

■■■ As to Nurse Rohling: again assuming plaintiff's version of events to be true, her refusal to administer plaintiff a single dose of Naprosyn the following morning also qualifies as *de minimis.* The undisputed evidence indicates that plaintiff had taken his Naprosyn the night before, thanks to Lt. Glass, so he had not been deprived of medication when he encountered Rohling. Assuming arguendo that Rohling refused to give him another dose of Naprosyn a few hours later, the effect of her action lasted only until plaintiff arrived at his next way-station (Auburn) a few hours later. At that point, the actions or inactions of officials at that facility (notably Nurse Kowal) intervene and cut off any causal connection between whatever pain or discomfort plaintiff was suffering as a result of the missed morning dose. Again, there is no evidence in the record from which one could conclude that the injury worked by Rohling was so great as to chill a person of ordinary firmness from filing grievances or lawsuits.

■■■ Finally, as to Nurse Kowal: the only claim against her in this lawsuit is her alleged refusal to administer Naprosyn to

Davidson at the end of the day on October 3, when plaintiff arrived at Auburn. Assuming arguendo that she did so, there is no evidence in this record that depriving a prisoner of one dose of a non-narcotic pain reliever—leading to at most several hours of discomfort at well below the constitutionally-infirm level (*see Davidson v. Chestnut,* 1998 WL 436527 (S.D.N.Y.1998) (declining to refill Davidson's Naprosyn prescription, which led to at most a few days of discomfort, did not violate his Eighth Amendment rights)) [6]—would chill a person a person of ordinary firmness from asserting his rights. And that is all Nurses Booth, Rohling and Kowal are alleged to have done—each allegedly deprived Davidson of one dose of a non-narcotic pain killer, thereby causing plaintiff several hours of discomfort at well below the threshold for an Eighth Amendment claim.

Accordingly, summary judgment dismissing the retaliation claims against Nurses Booth, Rohling and Kowal must be granted.

The moving defendants' motion is granted and the claims are dismissed as to them. The court *sua sponte* dismisses the claim as against the Estate of Sergeant Augustine.

This constitutes the decision and order of the court.

---

**6.** This aspect of Judge McKenna's opinion in *Davidson v. Chestnut* was not disturbed by the Second Circuit in *Davidson v. Chestnut,* 193 F.3d 144 (2d Cir.1999).